[Crim. No. 13914. First Dist., Div. Two. Nov. 5, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD LEE DONNELL, Defendant and Appellant.

764

## COUNSEL

Dennis K. Rothhaar, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and M. Janice Smith, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BRAY, J.**\*—Defendant appeals from judgment, after jury verdict, of conviction by the Santa Clara County Superior Court of certain crimes.

### QUESTIONS PRESENTED

1) Defendant may not be convicted of both taking and receiving the two Fords.

2) Admission of the fruits of the search of Aqua Fresca's trailer.

3) Evidence of the Beaverton similar admissible.

4) Defendant *used* a deadly weapon.

5) Section 3024, subdivision (b), of the Penal Code was improperly invoked.

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

## Record

Defendant was charged by information of violation of Penal Code section 211 (robbery), being armed with and using a shotgun in the course of the robbery (Pen. Code, § 12022.5), two counts of violation of Penal Code section 484 (grand theft), two counts of violation of Vehicle Code section 10851 (unlawful driving or taking of a vehicle) and with two counts of violation of Penal Code section 496 (receiving stolen property). He was also charged with a prior conviction of violation of Vehicle Code section 23110, subdivision (b), (discharging a firearm at a vehicle).

The jury convicted defendant of all counts except the two charging grand theft and found that defendant was armed and used a shotgun in the course of the robbery. Judgment was entered accordingly.

## Facts

As defendant does not attack the sufficiency of the evidence, a brief statement of the evidence will suffice, except for elaboration if necessary to explain the question of law raised.

On the morning of March 13, 1974, Jean Esway's maroon-with-black vinyl top Ford Galaxie, license number YSR-497, was stolen in Sunnyvale.

On either the evening of March 11 or 12, the vinyl-over-blue Ford of Robert Dowen was stolen in Fremont.

Sometime between 10:15 and 10:30 a.m., March 13, the two Fords pulled into the parking lot at the Edenvale substation on the grounds of an I.B.M. plant located approximately one mile from the Santa Teresa Branch, First National Bank of San Jose. Three witnesses saw three men get out of the blue Ford and enter the maroon Ford. None of the witnesses were able to see the driver of the maroon car.

At approximately 10:30 a.m., March 13, the bank was robbed by three men. Defendant was identified as the one who stood with a shotgun by the front door of the bank while two other men armed with handguns robbed it. The Esway maroon Ford Galaxie was identified as the getaway car.

About 11:30 a.m., defendant was arrested in the blue Ford. Defendant told the police he had stolen the car at a different place than that from which it was actually stolen. He later said that three people had come to his apartment and offered to pay him to "dump" the car.

1) *Defendant may not be convicted of taking and receiving the two Fords.*

The jury convicted defendant of two counts of unlawful driving or taking of a vehicle and also of two counts of receiving stolen property (the automobiles), that is, he was convicted of both taking and receiving the maroon Ford and the blue Ford.

The general rule is that one may not be convicted of stealing (taking), and of receiving the same stolen property. (*People* v. *Briggs* (1971) 19 Cal.App.3d 1034, 1036 [97 Cal.Rptr. 372]; *People* v. *Tatum* (1962) 209 Cal.App.2d 179, 183 [25 Cal.Rptr. 832].)

The People contend that this principle does not apply to the situation as to the Dowen car. The People contend that as the evidence shows that defendant was not an actual participant in the physical taking of the car but was liable as an accessory to the taking (because the evidence clearly shows that it was the robber's pattern to steal two cars to be used in the robbery), he could be found guilty of both taking and receiving the vehicle when he later was found driving it. But such a theory flies directly in the face of the well established principle of law that one cannot be convicted of the crimes of both taking and receiving the same property. Even though the person does not in the first instance physically take the vehicle, if the circumstances are such that in law he is considered to have taken it (as in this case), it would be absurd to separate the taking from the receiving, particularly as Penal Code section 971 abrogates any distinction between an accessory before the fact and a principal. It might just as logically be held that a person who steals a watch may also be convicted of receiving it.

The People rely on the following language in *People* v. *Kot* (1959) 171 Cal.App.2d 9, 13-14 [339 P.2d 899], a case in which the defendant was charged and convicted only with receiving stolen property: "But if defendant is a thief in the sense of being liable as a principal when a mere accessory and not an actual participant in the physical taking of the property, he would be culpable under section 496 if he later receives it from the actual perpetrator." This language is clearly dictum. Moreover,

the cases cited for support do not support the dictum. *People* v. *Day* (1916) 30 Cal.App. 762 [159 P. 457], held that even if the evidence "would have supported a charge of burglary," the evidence sufficiently supported the verdict of guilty of receiving stolen property and "therefore he [the defendant] cannot be heard to complain that the people elected to charge him with the [receiving stolen property] . . . offense rather than" the burglary. (At p. 763.) Nowhere in the opinion is any intimation that the defendant could properly be convicted of both offenses. *People* v. *Stoddard* (1941) 48 Cal.App.2d 86 [119 P.2d 160], was also an appeal from a conviction of receiving stolen goods. The court pointed out that although the defendant could have been charged with theft upon the theory that he was an accessory thereto, "still he was guilty of receiving stolen property taken and asported by his confederates." (At p. 90.) Nothing was said to the effect that he could have been convicted of both crimes.

As to the Esway convictions, the People contend that defendant was convicted of "driving" the car rather than "taking" it (Veh. Code, § 10851 makes it unlawful to either drive or take the vehicle of another); and that if a person may not be convicted of both "taking" and "receiving" a vehicle, he may be convicted of both "taking" and "driving" the stolen vehicle. However, there is no evidence to show that defendant was ever the driver of the Esway car. The witnesses at the I.B.M. plant did not see who was driving that car, nor did anyone else ever see defendant driving it. The evidence supports defendant's conviction of "taking" the car on the basis of his conspiring with the other robbers to obtain it to be, as it was, used in the robbery.

The two convictions of violation of Penal Code section 496 (receiving stolen property) should be reversed. (See *People* v. *Briggs, supra,* 19 Cal.App.3d 1034 at p. 1037.)

2) *The search of Aqua Fresca's trailer.*

██ On August 6, 1974, David M. Aqua Fresca was arrested in Roseburg, Oregon and interrogated by the F.B.I. Aqua Fresca signed an authorization to search his house trailer. Among the items found there were a shotgun, pillowcase, two raincoats and three hoods made of grey sweatshirt type material, which a witness testified were similar to those used in the San Jose robbery and which were admitted in evidence over defense objection. Defendant contends that the prosecution did not carry

its burden of proving consent[1] to the search and hence it was error to admit the evidence.

■ One may waive his right to be free from unreasonable searches and seizures. The burden is on the prosecution to show by clear and positive evidence that the consent to search made without a warrant was freely, voluntarily and knowledgeably given. (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)

■ The issue of the admission of this consent and the material discovered in the search was expressed by the court, "the prosecution offers the testimony of the F.B.I. agent that he received from Mr. Aqua Fresca, a written consent to search Mr. Aqua Fresca's property, and that this written consent disclosed—the search disclosed the items which have been marked for identification, mainly the hoods, the raincoats, sawed-off shotgun and the other items contained in the suitcase. [¶] The defendant has objected to this testimony on the ground that the consent given by Mr. Aqua Fresca is hearsay, . . ." The court then stated that defendant claimed "the right to object to the validity of the search and seizure by the F.B.I. of Mr. Aqua Fresca's possessions under this vicarious exclusionary rule. . . ." (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1].) The court further stated that the prosecution offered the testimony of the F.B.I. agents concerning Aqua Fresca's consent and the written consent "not for the truth of the statements, but merely to show the conduct or the action taken by the F.B.I."

It was conceded that Aqua Fresca's statements and written consent were hearsay and their admissibility depended upon whether they came within the exception to the hearsay rule set forth in Evidence Code section 1250. That section provides in pertinent part: ". . . evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

---

[1] A copy of the consent was introduced in evidence. One of the F.B.I. agents had the original in his possession. Defense counsel stated that he was objecting to the admission of either the copy or the original. Apparently, in the lengthy discussion concerning the admission of the consent, it was felt unnecessary to replace the copy by the original.

The Attorney General contends that this section makes the evidence admissible evidence of "either . . . the declarant's state of mind or the listener's [Officer Enyart's] state of mind." Unfortunately the only authority offered by the Attorney General is section 1250. In its brief, he states: "Counsel confuses the admissibility of the statement 'he told me it was okay to search' with what the statement could be used to prove. It did not necessarily *prove* the voluntariness of Mr. Fresca's consent. However, a *prima facie* showing of voluntariness was established by the officer's non-objectionable testimony regarding the circumstances surrounding the giving of the consent."

However, the prosecution stipulated that Aqua Fresca's statements and written consent were offered not for the truth of the statements but merely to show that the F.B.I. agents acted reasonably in believing that a consent had been given. It is difficult to understand how evidence offered not to prove truth could still be prima facie evidence that consent had been given.

It is not clear why the prosecution agreed that the evidence showing that Aqua Fresca's consent was free and voluntary would constitute hearsay. Defendant may not invoke the vicarious exclusionary rule which is "that a criminal defendant is entitled to object to the introduction of evidence *illegally seized*," as the evidence was not illegally seized. (Italics added.) (*Kaplan* v. *Superior Court, supra,* 6 Cal.3d 150 at p. 155.) Aqua Fresca was not a witness in the case nor did he make any statement incriminating defendant. He merely consented to allowing his property to be searched. Under the evidence here that Aqua Fresca's consent to the search was voluntary, there was no illegality in the search or seizure.

Defendant has produced no authority to the effect that a consent shown to be legally obtained is not admissible in evidence, nor that the written consent of a third party can only be proved by the signer. However, it was stipulated that the only purpose of the evidence was to show the reasonableness of the agents' acts but not to show the truth that Aqua Fresca consented either orally or in writing.

As said in *People* v. *Gorg* (1955) 45 Cal.2d 776, 782 [291 P.2d 469]: ". . . where consent to search is claimed by the People, evidence must be presented that will enable the court to determine for itself whether consent was in fact given."

The problem before the court on this issue was whether Aqua Fresca had consented to the search of his trailer. Thus, his state of mind at the time of the transaction at issue was required to be determined. Section 1250 of the Evidence Code states in pertinent part that "evidence of a statement of the declarant's then existing state of mind . . . is not . . . inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind . . . at that time . . . when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

McCormick on Evidence (2d ed. 1972) section 294, page 694, states: "The substantive law often makes legal rights and liabilities hinge upon the existence of a state of mind in a person involved in the transaction at issue. . . . While such a state of mind may be proved by the person's actions, the declarations of the person whose state of mind is at issue are often a primary source of evidence on this matter. In most cases, the declarations are not assertive of the declarant's present state of mind and are therefore not necessarily within the hearsay exclusionary rule. Courts, however, have tended to lump together declarations asserting the declarant's state of mind with those tending to prove the state of mind circumstantially, and have developed a general exception to the hearsay rule for them without regard to the possibility that many could be treated simply as *nonhearsay*." (Italics added.)

One of the examples McCormick gives under this rule is "a statement of willingness to allow one the use of the declarant's automobile offered to prove that the car was used with the owner's consent under the terms of an insurance policy, . . ." (At p. 695.)

Under Evidence Code section 1250 and the rule as stated by McCormick, Aqua Fresca's statements and the consent form were admissible.

Defendant has offered no authority to support his contention that producing the consent without Aqua Fresca testifying to it violated United States Constitution, Sixth Amendment, the confrontation clause, which provides that a defendant must be confronted with the witnesses against him. As stated, Aqua Fresca was not a witness against defendant. He merely consented that the officers might search his trailer.

We find no authority holding that Aqua Fresca's consent properly obtained was not admissible. (See Witkin, Cal. Evidence (2d ed. 1966) Exclusion of Illegally Obtained Evidence, § 88 et seq. [1974 Supp. p. 94],

citing cases holding consent by cotenant both present and absent, parent, landlord after eviction of tenant, wife or mistress admissible; also 44 Cal.Jur.2d (1967) Searches and Seizures, § 27, p. 67.)

Mr. Enyart, the F.B.I. agent, who interviewed Aqua Fresca, testified that he advised him of his constitutional rights and that since the officers did not have a search warrant, Aqua Fresca had a constitutional right to refuse to give consent to a search of the trailer. Enyart did state that he could, however, obtain such a warrant. Fresca responded that he had no objection to a search being made. When he inquired what the agents were looking for he was informed that it was for evidence pertaining to a bank robbery. Again Aqua Fresca stated that he had no objection to the search and informed the agents of the location of both his trailer and his automobile. He then signed a consent form which was introduced in evidence.

The situation concerning this issue is most unusual. The evidence shows, without contradiction, that the consent to the search was voluntary and therefore the materials discovered in the search could have been admissible in evidence, unless the peculiar stipulation of the district attorney prevented it. Under the circumstances, it is not reasonable to hold that it did. The court knew from the stipulation that the district attorney was seeking to introduce in evidence the fruits of the search if it were found that the actions of the F.B.I. were reasonable in making the search and in admitting the materials the court was finding that they were reasonable and Aqua Fresca's consent voluntary. Otherwise, the court would have denied their admission. Had the district attorney not made the peculiar stipulation there can be no question but that the materials would have been admissible. In view of the uncontradicted evidence and the otherwise admissibility of the materials, the stipulation amounted at best to a technicality which should not be permitted to cause a retrial which, if the same evidence were introduced, would end in the same result.

### 3) *The Beaverton Similar.*

Evidence Code section 1101 provides in pertinent part: ". . . evidence of a person's character or a trait of his character (whether in the form of . . . specific instances of his conduct) is inadmissible when . . . . [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . .) other than his disposition to commit such acts."

In the application of this rule to criminal cases the general test of admissibility is whether the evidence tends logically, naturally and by reasonable inference, to establish any fact material for the People, or to overcome any material matter sought to be proved by the defense. (*People* v. *Schader* (1969) 71 Cal.2d 761, 775 [80 Cal.Rptr. 1, 457 P.2d 841].)

" 'If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' " (*People* v. *Peete* (1946) 28 Cal.2d 306, 315 [169 P.2d 924].)

It is for the trial court to determine whether the probative value is outweighed by the possible prejudicial effect and to admit or exclude it accordingly. (*People* v. *Greene* (1973) 34 Cal.App.3d 622, 635 [110 Cal.Rptr. 160].)

"Probative value and prejudice obviously are not commodities subject to quantitative measurement. . . . The chief elements of probative value are relevance, materiality and necessity. [¶] [T]he court must ascertain that the evidence (a) 'tends logically, naturally and by reasonable inference' to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue. . . :" (*People* v. *Schader, supra,* 71 Cal.2d 761 at pp. 774-775.)

" 'The general rule is that evidence of other crimes is inadmissible when it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, because the probative value of such evidence is outweighed by its prejudicial effect. . . . [¶] However, under certain limited circumstances, when the evidence is sufficiently relevant, it may be admitted even though it embraces evidence of the commission of another crime. . . . It has frequently been recognized, however, that because of the sound reasons behind the general rule of exclusion, the relevancy of evidence of other crimes, and therefore its admissibility, must be examined with care. [Citation.] The evidence should be received with "extreme caution," and if its connection with the crime charged is not clearly perceived, the doubt should be resolved in favor of the accused. [Citations.] . . .' [¶] When, as in the instant case, a primary issue of fact is whether or not defendant rather than some other person was the perpetrator of the crime charged,

evidence of other crimes is ordinarily admissible if it discloss [*sic*] a distinctive *modus operandi* common to both the other crimes and the charged crime. [Citations.]" (*People* v. *Haston* (1968) 69 Cal.2d 233, 244-245 [70 Cal.Rptr. 419, 444 P.2d 91].) The court in *Haston* goes on to detail a method by which to determine whether the evidence shows a distinctive common modus operandi. This method was summarized and again approved in the very recent California Supreme Court case of *People* v. *Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43].

In *Antick,* the court wrote: "In *People* v. *Thornton, supra,* 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], we summarized the guiding principles which *Haston* established: '[T]he probative value of such evidence on the issue of identity is dependent upon the extent to which it raises an inference that the perpetrator of the uncharged offense was the perpetrator of the charged offense, and . . . the determination as to the presence and strength of such an inference proceeds through an evaluation of marks shared by the uncharged and charged crimes. . . . "It is apparent that the indicated inference does not arise . . . from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." . . . [B]ecause the probative value of other-crimes evidence on the issue of identity depends wholly upon the strength of the inference, and because the prejudicial effect of such evidence is always manifest, the court's discretion should be exercised in favor of exclusion if the inference of identity is weak. . . . [¶] To recapitulate, only common marks having some degree of distinctiveness tend to raise an inference of identity and thereby invest other-crimes evidence with probative value. The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks.' (*Id.* at p. 756.)" (At pp. 93-94.)

██ In the instant case a number of similarities exist between the San Jose and Beaverton robberies. Both were robberies of banks at about the same time of day (San Jose at 10:30 a.m., Beaverton at 11 a.m.). In each, the robbers were three men, and a witness to the San Jose robbery, when shown a photo taken during the commission of the Beaverton robbery, testified that the physical description of the three men she observed in the San Jose robbery matched that of the three men depicted in the Beaverton photograph. In each instance, the perpetrators were described as wearing hoods, with eyeholes, which covered their heads to the shoulders and which appeared to be made of grey sweatshirt-like material.[2] In each, a tall man, approximately six feet or six feet, one inch tall, positioned himself near the front door and held a shotgun and a shorter man jumped over the teller counter. In the San Jose robbery, as the tall man walked in he said, "This is it. Everyone to the floor." A witness to the Beaverton robbery testified that the robbers, upon entering the bank "told us to get on the floor and that it was the real thing." In the San Jose robbery the tall man at the door had a stopwatch in his hand. In the Beaverton robbery the man at the door kept looking at his watch. One witness to the San Jose robbery said that the man at the door yelled "Time" twice and the robbers exited; another witness said that the man yelled "Time" three times and "something like, 'Let's go.' " In Beaverton the man at the door looked at his watch and said, "Let's get out of here" and the robbers left. After both robberies the perpetrators left the scene in stolen Fords (San Jose in a maroon with black vinyl top Ford, Beaverton in a white with black vinyl top Ford). In each instance the car was found abandoned and the ignition was out.

While a number of the common characteristics shared by each of the two robberies, such as the fact that the robbery was of a bank, in the morning, and by three men, could not be characterized as "distinctive" shared marks which in any way differentiated these robberies from many similar such crimes, there are certain shared "distinctive marks." These include the fact (1) that the three men in each robbery had the same physical description; (2) that in each instance the getaway car was a stolen Ford, each with a colored body and black vinyl top, and each found abandoned with the ignition out; (3) that in each instance one of the shorter robbers jumped over the teller's counter; and (4) most

---

[2] One witness to the San Jose robbery testified that the hoods were of a canvas type material. However, when she viewed the hoods taken from Aqua Fresca's trailer she stated that from a distance they did look like canvas type material to her. This same witness also indicated that the hoods worn by the robbers in the San Jose robbery did not have knots on top like the ones taken from Aqua Fresca's trailer. However, she asked that one of the hoods in evidence be turned inside out and then stated, "Yes, that is it, right there. There is no knot then."

significantly that in each instance the men wore what appeared to be homemade hoods which looked the same and appeared to be made from the same grey sweatshirt-like material. While these marks vary in distinctiveness, they are all of substantially less than common occurrence. From the above, the court may conclude that the number and distinctiveness of the marks shared by the two incidents are sufficient to have raised a strong inference that the perpetrator of one was included among the perpetrators of another.

Defendant claims that it was error to admit the evidence of the Beaverton bank robbery because the evidence was insufficient to link him to that crime. ■ The rule to be applied is that "[a]lthough a person charged with crime cannot be convicted thereof unless he is proved guilty beyond a reasonable doubt, *other uncharged offenses introduced to show the existence of some element of the charged crime need only be proved by a preponderance of substantial evidence.* [Citations.] The situation is otherwise when such offenses are sought to be utilized on penalty issues; . . ." (Italics added.) (*People* v. *Durham* (1969) 70 Cal.2d 171, 187, fn. 15 [74 Cal.Rptr. 262, 449 P.2d 198], cert. den., 406 U.S. 971 [32 L.Ed.2d 671, 92 S.Ct. 2416], 395 U.S. 968 [23 L.Ed.2d 755, 89 S.Ct. 2116].) " '[A]t the trial on the issue of guilt the jury must be convinced only that it is more probable than not that the defendant committed other crimes before it may consider them [citation], . . .' " (*People* v. *McClellan* (1969) 71 Cal.2d 793, 805 [80 Cal.Rptr. 31, 457 P.2d 871].) "[T]he proof must . . . be sufficient to arouse more than mere suspicion; it must afford 'substantial evidence' that the prior offense was in fact committed by the defendant. [Citations.]" (*People* v. *Albertson* (1944) 23 Cal.2d 550, 579 [145 P.2d 7].) (And, see *People* v. *Haston, supra,* 69 Cal.2d 233 at p. 253; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 331 [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Lisenba* (1939) 14 Cal.2d 403, 429-432 [94·P.2d 569], affd. 314 U.S. 219 [86 L.Ed. 166, 62 S.Ct. 280], 313 U.S. 537 [85 L.Ed. 1507, 61 S.Ct. 832].)

■ In the instant case there was a preponderance of substantial evidence that defendant committed the Beaverton bank robbery. Doris Pribble, a former neighbor of defendant's was shown photos taken during the Beaverton robbery of the three hooded robbers. She initially testified that she was "positive" that one of the persons depicted was the defendant due to his build and clothes. On cross-examination she testified that the pants, shoes and jacket worn by one of the pictured robbers resembled those of defendant but that because the person had a hood over his head she could not "absolutely" or "positively" identify him as defendant.

A former girl friend of defendant's, Mary Cahill, was shown the pictures of the Beaverton robbery and asked if she had an opinion as to who one of the robbers was. She answered, "I have reason to believe that it could be, judging by the appearance of the man, Richard Donnell." The testimony of these two women provided sufficient evidence linking defendant to the Beaverton robbery that the trial court could properly allow evidence of the robbery.

The questioned similar was properly admitted under Evidence Code section 1101.

### 4) *Defendant used a deadly weapon.*

██ Defendant contends that there was no evidence that he "used" the shotgun which he held during the robbery and that, therefore, the recital invoking Penal Code section 12022.5[3] should be stricken from the judgment.

". . . By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed. [Citation.] . . . Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' (Webster's New Internat. Dict. (3d ed. 1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024].)

In this case defendant entered the bank holding the shotgun for everyone to see and yelled: "This is it. Everyone to the floor." One woman screamed.

It is absurd to suggest that using a shotgun to intimidate the persons in the bank while confederates rob the bank is not using the firearm in the commission of a robbery or even to suggest that the presence of the shotgun did not produce a "fear of harm or force" by means of its display. The mere display of the shotgun was "conduct which produces a

---

[3]Section 12022.5 of the Penal Code authorizes additional punishment of a "person who uses a firearm in the commission or attempted commission of a robbery."

fear of harm or force by . . . display of a firearm in aiding the commission of [the robbery]." (*People* v. *Chambers, supra,* at p. 672.)

5) *Section 3024, subdivision (b), of the Penal Code cannot apply.*

█ The judgment provided that the prior (violation of § 23110, subd. (b), discharging a firearm from a vehicle) which defendant admitted, should be used to enhance the penalty as to count one only. This was pursuant to section 3024, subdivision (b), which provides in effect that the minimum term of a person armed with a deadly weapon at the time of the commission of an offense, and previously convicted of a felony, should be four years.

The cases are clear that the provision of Penal Code section 3024 are inapplicable where the defendant is found guilty of first degree robbery on the basis of the fact that he was armed. (*People* v. *Najera* (1972) 8 Cal.3d 504, 508 [105 Cal.Rptr. 345, 503 P.2d 1353]; *People* v. *Williams* (1970) 2 Cal.3d 894, 910 [88 Cal.Rptr. 208, 471 P.2d 1008], cert. den., 401 U.S. 919 [27 L.Ed.2d 821, 91 S.Ct. 903]; *People* v. *Floyd* (1969) 71 Cal.2d 879, 883 [80 Cal.Rptr. 22, 457 P.2d 862].) Therefore, the section 3024 recital should be stricken from the abstract of judgment.

Those portions of the judgment convicting defendant of violating Penal Code section 496 are reversed. The application to the sentences of section 3024 of the Penal Code is stricken. In all other respects the judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.