518 A.2d 1072

James Othel **WYNN**

v.

**STATE of Maryland.**

**No. 205, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Jan. 7, 1987.

Greta C. Van Susteren, Washington, D.C. (Alan H. Murrell, Public Defender, Baltimore, and Ilene Cohen, Assigned Public Defender, Annapolis, on the brief), for appellant.

Ronald M. Levitan, Asst. Atty. Gen. (Stephen H. Sachs, Atty.Gen., Baltimore, Andrew L. Sonner, State's Atty. for

Montgomery County and Jack Hanly, Asst. State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Submitted before ALPERT, ROSALYN B. BELL and ROBERT M. BELL, JJ.

ALPERT, Judge.

During the last three months of 1984, some thirty-five to forty burglaries were committed on Friday and Saturday nights in the area surrounding the Fort Sumner subdivision in Montgomery County. On at least six occasions, a black male was seen at or near the scene of the crime. On one occasion, a man acting suspiciously was seen wearing a brown shoulder bag. In response to the rash of burglaries, a Special Assignment Team of eighteen plainclothes police officers in unmarked vehicles was assigned to surveillance duties in the area on the night of Saturday, January 12, 1985.

At approximately 8:30, one of the officers saw a black male wearing a red and white knit cap, a dark coat, and loose fitting jeans, carrying a brown leather shoulder bag. The officer radioed the description and location of the man to the other members of the Team, who converged on the surrounding five or six block area.

Two members of the Team, Officers Robert C. Tompkins and Frank Mathis, were working together in a dark blue van. After driving around the area without seeing the man described in the radio transmission, they parked the van and waited. After three or four minutes, they saw a man emerge from the shadows between two houses and begin to walk in the direction of the van. When the man became visible in the street light, Officer Tompkins said, "That is the man. That's him. Let's get him." The officers got out of the van and began to approach the man. When the man saw them, he changed the direction of his travel. Officer Tompkins called out, "Halt. Police." The man faced the officer, lifted the right side of his waist-length jacket and appeared (to the officer) to draw a handgun from a light

brown holster. Tompkins drew his gun and fired three shots. One of these shots struck the man.

The man yelled, turned, and ran around the side of a house. After a foot chase through several yards, the police found the man lying next to a sandbox near a large hedgerow of big evergreens and a fence. The man was arrested and handcuffed. He was later identified as appellant James Othel Wynn.

The police found an empty light brown holster on an ammo belt and a light brown glove lying on the ground near appellant. The ammo belt contained .38 caliber cartridges. At various points along the trail of the chase, aided by footprints in the snow that had fallen the previous day, the police recovered a loaded .38 caliber Colt revolver, a red and white knit cap, and a brown leather shoulder bag. The bag contained a small flashlight, a small chrome pry bar, a quantity of jewelry, and a .22 caliber Baretta pistol.

At approximately one o'clock the following morning, Mr. and Mrs. Hans Prauser, residents of the Fort Sumner subdivision, reported a burglary of their home during the prior evening at police headquarters. They identified the jewelry and Baretta pistol found in appellant's bag as having been taken from their home.

Appellant was charged with housebreaking, theft, use of a handgun in the commission of a crime of violence (housebreaking), assault with intent to murder, assault with intent to prevent apprehension, use of a handgun in the commission of a felony (assault with intent to prevent apprehension), simple assault, and two counts of carrying handguns. He was tried by a jury in the Circuit Court for Montgomery County (Cave, J.).

At the end of the State's case, a judgment of acquittal was entered on the charge of assault with intent to murder. The jury acquitted appellant of assault with intent to prevent apprehension and use of a handgun in the commission of that offense. They convicted him of housebreaking, theft, use of a handgun in the commission of a crime of

violence (housebreaking), assault, and both counts of carrying handguns.

The court imposed concurrent sentences of ten years for housebreaking, eight years for theft, four years for assault, and two years for one count of carrying a handgun. The other carrying count was merged into the use of handgun charge. The court imposed a consecutive sentence of fifteen years (ten years suspended) for use of a handgun in the commission of a crime of violence. The appellant presents four issues on appeal from those judgments. He contends that:

1. Evidence obtained via an arrest made without probable cause should have been suppressed;

2. Deadly force was used unlawfully to accomplish appellant's arrest;

3. The evidence was insufficient to sustain the convictions for housebreaking and theft; and

4. The evidence was insufficient to sustain the conviction for use of a handgun in the commission of a crime of violence (housebreaking).

## I.

Appellant contends that he was arrested without probable cause and that the items of physical evidence obtained by the police were seized as a result of that arrest. He asserts that that evidence should have been suppressed. He argues:

It is without question that Officer Tompkins had every right to accost Appellant and to request identification and an explanation of his activities. *Foster v. State,* 272 Md. 273 [323 A.2d 419] (1974). But an officer who initiates an arrest must have more; he must have probable cause to believe that a crime has been or is about to be committed, and that the suspect is involved in the crime. *Randolph v. State,* 1 Md.App. 441 [230 A.2d 688] (1967).

The linchpin of the appellant's argument is that he was "arrested" when Officer Tompkins formulated the subjec-

tive intent to do so and announced that he was a policeman. We disagree.

As the Court of Appeals pointed out in *Little v. State*, 300 Md. 485, 509–10, 479 A.2d 903 (1984):

> We have defined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. *Bouldin v. State*, 276 Md. 511, 516, 350 A.2d 130 (1976); *Cornish v. State*, 215 Md. 64, 137 A.2d 170 (1957). An arrest is effected (1) when the arrestee is physically restrained or (2) when the arrestee is told of the arrest and submits. *Bouldin, supra*, 276 Md. at 516, 350 A.2d 130. In sum "an arrest is the taking, seizing or detaining of the person of another, *inter alia*, by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest." *Morton v. State*, 284 Md. 526, 530, 397 A.2d 1385 (1979). When a person is merely approached by an officer and questioned briefly about his identity, however, there is no formal arrest under Maryland common law. *Foster and Forster v. State*, 272 Md. 273, 323 A.2d 419 (1974), *cert. denied*, 419 U.S. 1036, 95 S.Ct. 520, 42 L.Ed.2d 311 (1974); *Duffy v. State*, 243 Md. 425, 221 A.2d 653 (1966); *Shipley v. State*, 243 Md. 262, 220 A.2d 585 (1966); *Jones v. State*, 242 Md. 95, 218 A.2d 7 (1966); *Cornish, supra*; E. Fisher, *Laws of Arrest* § 37 at 76–77 (1967).

When Officer Tompkins shouted, "Halt. Police," appellant was not physically restrained, nor did he submit to custody. To the contrary, at that point Wynn sprang into a shortlived flight to freedom. The arrest in the instant case occurred *after* the chase, not before it. Even if we assume that no probable cause to arrest appellant existed at the time he was accosted, it clearly existed at the time he was apprehended. Furthermore, in our view, the physical evidence obtained by the police was not seized as a result of the arrest; it was abandoned by the appellant during the chase. *See Morton v. State*, 284 Md. 526, 531, 397 A.2d 1385 (1979) and *Jackson v. State*, 52 Md.App. 327,

334, 449 A.2d 438, *cert. denied,* 294 Md. 652 (1982). The trial court did not err in refusing to suppress the evidence.

## II.

■ Appellant next contends that "[b]ecause Officer Tompkins did not have adequate probable cause to believe that appellant posed a threat of serious physical harm, his use of deadly force was improper and in contravention of the Supreme Court's pronouncements in *Tennessee v. Garner,* [471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d. 1 (1985)]." Appellant makes no suggestion as to what the appropriate remedy should be, and with good reason—whether the officer used excessive force is not an issue in this case because it was not raised in the lower court and because it is immaterial to appellant's guilt or innocence and to the fairness of his trial. While the use of excessive force in an arrest may, as in *Garner,* be material in certain civil actions, it is immaterial in the instant criminal case.

## III.

■ Appellant next contends that the evidence was insufficient to sustain his convictions for housebreaking and theft because there was no direct evidence that he broke into the Prausers' home and stole the items found in the bag; the only evidence against him was circumstantial.

As we reiterated in *Samuels v. State,* 54 Md.App. 486, 493, 459 A.2d 213 (1983):

> Unexplained possession of recently stolen goods gives rise to an inference that the possessor is the thief; if the theft occurred as part of a burglary or robbery, the inference is that the possessor is the burglar or robber.

The circumstantial evidence was sufficient to sustain the convictions for housebreaking and theft.

## IV.

Finally, appellant contends that the evidence was insufficient to sustain his conviction for use of a handgun in the

commission of a crime of violence. Appellant notes that, while police found him in possession of a handgun shortly after the housebreaking, there was no evidence that he used the gun in the Prausers' house. He argues that one may not be convicted of using a handgun in the commission of a housebreaking when one is found merely to be in possession of the gun shortly after committing the housebreaking. We do not agree.

The legislature adopted a comprehensive scheme of statutory regulation of handguns through the Handgun Control Act of 1972, Ch. 13 of the Acts of 1972, now codified at Art. 27, Sections 36B–36F. The rationale for that regulation is embodied in the first subsection of Art. 27, Section 36B:

(a) Declaration of policy.—The General Assembly of Maryland hereby finds and declares that:

(i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns;

(ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity;

(iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and

(iv) Further regulations on the wearing, carrying, and transporting or handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens.

This policy has been implemented through several measures. Chief among those measures for present purposes is Md.Code, Art. 27 Sec. 36B(d), which provides in pertinent part:

Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the

commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor....

Section 441 defines housebreaking as a crime of violence.

The essence of appellant's argument is that by merely carrying a handgun during the Prausser housebreaking,[1] he did not "use" the weapon within the meaning of Section 36B(d). Thus, we are called upon to define the term "use" within the broader phrase "use [of] a handgun ... in the commission of [a housebreaking]." We note that no definition of "use" appears in the "Handguns" subtitle, nor have the appellate courts of this state been called upon to construe the term before this appeal.

The Court of Appeals has recently restated the often used rules of statutory construction.

In construing a statute, a court must ascertain and carry out the real legislative intent. *Police Comm'r v. Dowling*, 281 Md. 412, 418, 379 A.2d 1007 (1977). The court looks first to the language of the statute, assuming that it is to be afforded its ordinary and generally understood meaning. *Mauzy v. Hornbeck*, 285 Md. 84, 92–93, 400 A.2d 1091 (1979). If the statutory language contains no ambiguity or obscurity, the court generally looks no further. *State v. Fabritz*, 276 Md. 416, 421, 348 A.2d 275 (1975), *cert. denied*, 425 U.S. 942 [96 S.Ct. 1680, 48 L.Ed.2d 185] (1976).

When a statute can be fairly read to have more than one meaning, however, the court will examine the statute's subject matter, purpose, and object and consider the consequences flowing from different constructions. *State v. Berry*, 287 Md. 491, 496, 413 A.2d 557 (1980). If

---

**1.** Appellant does not challenge the sufficiency of the evidence tending to show that he carried the gun during the housebreaking. Indeed, he concedes in argument that, while he possessed the gun in the Prausser house, there was no proof that he "used" the weapon. In any event, the fact that appellant possessed the gun a short distance from the scene of his crime shortly after committing the crime, would support an inference that he carried the gun while committing the crime.

one of the proposed interpretations would render the statute valid while another would render it invalid or ineffective, the court will construe the statute to be valid whenever feasible. *Pickett v. Prince George's County,* 291 Md. 648, 661, 436 A.2d 449 (1981).

*In Re: Criminal Investigation No. 1–162,* 307 Md. 674, 685, 516 A.2d 976 (1986).

The ordinary and generally understood meaning of the term "use" is broad indeed even when narrowed by being placed in the context of "use of a handgun." The second and third definitions found in Webster's *Third New International Dictionary* at pages 2523 and 2524 include the following:

> to put into action or service; to have recourse to or enjoyment of ... to carry out a purpose or action by means of: make instrumental to an end or process....

Under these generally understood meanings of the term "use," section 36B(d) would create criminal liability when a handgun is "instrumental to" or part of the housebreaking, as for example, when entry is gained by means of the weapon. Such an interpretation, however, would not serve the expressed declaration of the handgun law—to protect people—and would lead to an absurd interpretation of § 36B(d). As we recognized in *Jeter v. State:*

> "[P]istols are used by burglars, not for breaking into safes, but for preventing interference with the criminal design or arrest by those who may discover its existence."

9 Md.App. 575, 579, 267 A.2d 319 (1970), quoting *People v. Durham,* 70 Cal.2d 171, 74 Cal.Rptr. 262, 449 P.2d 198 (1969). We may safely assume that the General Assembly did not intend to deter criminals from breaking window panes with gun butts when it created criminal responsibility for using a handgun in the commission of a housebreaking. As the Court of Appeals stated most recently: "That a term may be free from ambiguity when used in one context but of doubtful application in another context is well settled."

*Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 74, 517 A.2d 730 (1986).

Cognizant of the legislature's expressed purpose in adopting Section 36B(d) and ignoring those interpretations that would lead to an absurd result, we must construe the statute so as not to render the inclusion of housebreaking among its parts as mere surplusage. *See Scott v. State,* 297 Md. 235, 465 A.2d 1126 (1983).

■ In committing a burglary, whether statutory or common law, an intruder "uses" a handgun merely by carrying it with him in anticipation of preventing interference with his criminal design. By carrying the handgun, the burglar's nefarious task is more easily accomplished because he operates under the assurance that, if discovered, he will probably enjoy an advantage over the unlucky person who discovers him. In this sense, the handgun is "instrumental to [his] end." When the General Assembly created the separate offense of using a handgun in the commission of a crime of violence, housebreaking was already defined, pursuant to section 441, as a crime of violence. Consistent with the purpose and object of § 36B, we believe the legislature intended to deter criminals from carrying handguns into the homes of others and to protect the citizens of this State from the violent crimes perpetrated by gun-carrying burglars. As Justice O'Connor noted in a recent dissent:

> Household burglaries represent not only the illegal entry into a person's home, but also "pos[e] real risk of serious harm to others." *Solem v. Helm,* 463 U.S. 277, 315–316 [103 S.Ct. 3001, 3022–23, 77 L.Ed.2d 637] (1983) (Burger, C.J., dissenting). According to recent Department of Justice statistics, "[t]hree-fifths of all rapes in the home, three-fifths of all home robberies, and about a third of home aggravated and simple assaults are committed by burglars." Bureau of Justice Statistics Bulletin, Household Burglary 1 (January 1985). During the period 1973–1982, 2.8 million such violent crimes were committed in

the course of burglaries. *Ibid....* Moreover, even if a particular burglary, when viewed in retrospect, does not involve physical harm to others, the "harsh potentialities for violence" inherent in the forced entry into a home preclude characterization of the crime as "innocuous, inconsequential, minor, or 'nonviolent.'" *Solem v. Helm, supra,* at 316 [103 S.Ct. at 3023] (Burger, C.J., dissenting). See also Restatement of Torts § 131, Comment g (1934) (burglary is among felonies that normally cause or threaten death or serious bodily harm); R. Perkins & R. Boyce, Criminal Law 1110 (3d ed. 1982) (burglary is dangerous felony that creates unreasonable risk of great personal harm).

*Garner,* 471 U.S. at 26–27, 105 S.Ct. at 1707 (O'Connor, J., dissenting).

This court expressed a similar view in *Davis v. State,* 68 Md.App. 581, 514 A.2d 1229 (1986):

Daytime housebreaking is a crime, like burglary, that raises the very real possibility of serious harm to persons or property.

68 Md.App. at 591, 514 A.2d 1229. In *Davis,* we thought it significant, in determining that defendant's housebreaking involved no threat of violence, that there was no evidence that Davis "was armed with a dangerous weapon when he committed [the housebreaking]." The opposite is true in the case at bar.

To require proof that the intruder brandished the gun against the homeowner would make the offense duplicative of use of a handgun in the commission of a robbery or an assault. To require proof that the intruder employed his weapon as part of the housebreaking (*e.g.,* to break a window in gaining entrance) would run contrary to the legislature's intention to protect citizens and would lead to an absurd result.[2]

---

2. Arson is also defined as a crime of violence pursuant to Section 441. Md.Ann.Code art. 27 § 441(e) (1982 Repl.Vol.). Certainly, use of a

■ Evidence tending to show that appellant carried a handgun in the course of a housebreaking was sufficient to establish that he "used" the handgun in the commission of that offense, and therefore to support his conviction pursuant to Section 36B of the criminal law article.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.

ROBERT M. BELL, Judge, dissenting.

I cannot agree that the legislature intended "use of a handgun in the commission of a crime of violence", even in the context of a housebreaking, to be identical to the mere possession of a handgun. Accordingly, I dissent from the majority's holding that it is.

Maryland Code Ann. art. 27, § 36B(d), provides, in pertinent part:

> Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor. . . .

Section 441 defines housebreaking as a crime of violence. The legislature did not define the term "use," as it applies to § 36B(d) and neither the Court of Appeals nor this Court has had the occasion squarely to do so.

> To ascertain and effectuate the actual legislative intention in enacting any statute is, of course, the cardinal rule of statutory interpretation. *Sites v. State*, 300 Md. 702, 481 A.2d 192 (1984). In this regard, the primary source

---

handgun in the commission of an arson is not limited to those circumstances in which the fire is started with the handgun. There, too, it is the real danger that crimes against property pose when perpetrated by gun-carrying criminals that the legislature sought to deter.

Further, because the defendant is committing a crime of violence while he is carrying a handgun, our interpretation does not duplicate § 36B(b), which creates criminal liability for merely carrying a handgun subject to certain exceptions.

of legislative intent is the language of the statute itself. *Blum v. Blum,* 295 Md. 135, 453 A.2d 824 (1983). Where the statutory provisions are unambiguous, no construction is required, *In Re Arnold M.,* 298 Md. 515, 471 A.2d 313 (1984), so that a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation. *Guy v. Director,* 279 Md. 69, 367 A.2d 946 (1977). But where a statute is plainly susceptible of more than one meaning, construction is required; in such circumstances, courts may consider not only the literal or usual meaning of words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983); *State v. Fabritz,* 276 Md. 416, 348 A.2d 275 (1975).

*State v. Intercontinental, Ltd.,* 302 Md. 132, 137, 486 A.2d 174 (1985). *See also In Re: Criminal Investigation No. 1-162,* 307 Md. 674, 685, 516 A.2d 976 (1986).

If the statutory language of the particular provision or section in its context is ambiguous, the statute must be examined as a whole and the interrelationship or connection between all of its parts considered. The statute should then be construed so that all of its parts are given effect and harmonized if possible, and should not be construed so as to render any language surplusage or meaningless.

*Scott v. State,* 297 Md. 235, 245–56, 465 A.2d 1126 (1983). Moreover, while we "shun a construction of the statute which will lead to absurd consequences", *Erwin & Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 311, 498 A.2d 1188 (1985), or which is "inconsistent with common sense," *Blandon v. State,* 304 Md. 316, 319, 498 A.2d 1195 (1985), we "may not insert or omit words to make a statute express an intention not evidenced in its original form." *Mayor of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174 (1984). Of course, the context in which a term is used may

render the term ambiguous. *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 517 A.2d 730 (1986).

Webster's New Collegiate Dictionary 1279 (1980) defines "use" as "to put into action or service: avail oneself of: EMPLOY ... to carry out a purpose or action by means of: UTILIZE." That work also defines the shared meaning element of the synonyms "use, employ, and utilize" as "to put into service esp. to attain an end."

"Possess," by contrast, is defined as "to have possession of ... to have and hold as property: OWN." "Have" is listed as the synonym. *Id.*, at 890.

It would appear that the literal and usual meaning of the word "use," construed without forced or subtle interpretation designed to extend or limit its scope, is something different than "possess." Putting a handgun into action or service is something more than merely having a handgun. One must possess a gun in order to use it; one does not use a gun by merely possessing it.

The language used in the statute is of clear import and the statute's meaning is thus plain and unambiguous. Ordinarily, my inquiry would end here, *see Bledsoe v. Bledsoe*, 294 Md. 183, 189, 448 A.2d 353 (1982); however, consistent with Judge Davidson's admonition in *Scott, supra*, my analysis will be taken to the next level. "In determining whether the meaning of a statute is ambiguous, it is not proper to confine interpretation to the isolated section to be construed. Rather, in determining the meaning of a particular provision or section, even where its language appears to be clear and unambiguous, it is necessary to examine that provision or section in context." *Id.*, 297 Md. at 245, 465 A.2d 1126.

The legislative policy in regulating handguns and pistols is contained in Maryland Code Ann. art. 27, § 36B(a):

(a) *Declaration of policy.*—The General Assembly of Maryland hereby finds and declares that:

(i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in

Maryland, and a high percentage of those crimes involve the use of handguns;

(ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity;

(iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and

(iv) Further regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens.

This policy has been implemented through the enactment of a comprehensive statutory scheme. *See* Maryland Code Ann. art. 27, §§ 36B–36F. Under this scheme, in addition to prohibiting their use in the commission of a felony or crime of violence, the legislature restricted the wearing, carrying and transporting of handguns. § 36B(b). *See also* Maryland Code Ann. art. 27, §§ 441–448 in which the legislature restricted the "sale or transfer" and "possession" of pistols and revolvers. Furthermore, the legislature prescribed a more severe penalty for carrying, wearing, or transporting a handgun "with the deliberate purpose of injuring or killing another person." § 36B(b)(iv).

The General Assembly has thus clearly addressed both the situation in which an individual's involvement with a handgun is passive, *i.e.* wearing, carrying or transporting, and that in which it is active, *i.e.* using a handgun for criminal purposes. And its recognition, in § 36B(b)(iv), that "possession" of a handgun may be a prelude to its "use" leads me to conclude that the legislature did not equate mere possession with "use." Therefore, if the statute is to be construed so that all of its parts are given effect and harmonized, and none is rendered surplusage or meaningless, *Scott, supra,* "use" must mean something more than "possess", that is to say something more than "wear, carry,

or transport." This construction of § 36B(d) is consistent with the construction given similarly worded statutory provisions by our sister States. *See e.g., Jordon v. State,* 274 Ark. 572, 626 S.W.2d 947 (1982); *State v. Chouinard,* 93 N.M. 634, 603 P.2d 744 (1979); *People v. Donnell,* 52 Cal.App.3d 762, 125 Cal.Rptr. 310 (1975); *People v. Chambers,* 7 Cal.3d 666, 102 Cal.Rptr. 776, 498 P.2d 1024 (1972).

*Chambers* and *Chouinard* are of particular significance. In *Chambers,* the statute construed provided, in pertinent part, that "Any person who uses a firearm in the commission or attempted commission of [certain felonies] shall ... be punished by imprisonment ... for a period of not less than five years...." Cal.Penal Code § 12022.5 (West 1970).[1] Although recognizing that the legislative intent required that "uses" be broadly construed, the Court held:

> By employing the term "uses" instead of "while armed" the Legislature requires something more than merely being armed.... One who is armed with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest.... Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. "Uses" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." ... (citations omitted)

*Id.,* 102 Cal.Rptr. at 779–80.

The Court in *Chouinard* was called upon to interpret the New Mexico firearm enhancement statute, which provided:

---

1. It is interesting that the *Chambers* Court did not find it necessary to refer to Cal.Penal Code § 12022(a) which, since 1956 prohibited the commission or attempted commission of a felony by "[a]ny person who is armed."

A.  When a separate finding of facts by the court or jury shows that a firearm was used in the commission of: (1) any felony except a capital felony, the minimum and maximum terms of imprisonment prescribed ... shall each be increased by five years. ...

Relying on *Chambers,* the Court found the statute to be free from ambiguity and, thus, flatly held that " 'use' is different from 'possession' " and that "[t]he use of a firearm is something beyond mere possession of it." *Id.,* 603 P.2d at 745.  Moreover, it observed:

If the Legislature had intended the firearm enhancement provision to apply whenever a person committing a felony was armed, it would have written such a provision into the statute.  Compare the New Mexico armed robbery statute, § 30–16–2, N.M.S.A. (1978) (applicable to anyone who "commits robbery while armed with a deadly weapon");  18 U.S.C. § 924(c) (1970) (penalty for using or carrying a firearm during the commission of a felony); Cal.Penal Code § 12022(a) (West Cum.Supp.1979) (enhancement for attempt or commission of felony while armed);  Mich.Comp.Laws Ann. § 750.277b (Cum.Supp. 1979–1980) (carrying a firearm at commission of a felony is in itself a felony).

The majority asserts that because housebreaking was defined as a crime of violence prior to the enactment of § 36B(d), "the legislature intended to deter criminals from carrying handguns into the homes of others and to protect the citizens of this State from the violent crimes perpetrated by gun-carrying burglars."  What they do not tell us is why the legislature did not simply make it a crime for one to carry a handgun while committing a crime of violence. They cannot, because the legislature was quite precise in its choice of language:  in enacting § 36B(b), it chose the words, "wear, carry, transport";  and in enacting § 36B(d), the word "use".  It cannot be presumed that the legislature did not know the difference; in fact, the opposite must be presumed.  *See Police Comm'r v. Dowling,* 281 Md. 412, 419, 379 A.2d 1007 (1977);  *Glidden-Durkee (SCM) Corp. v.*

*Mobay Chemical Corp.,* 61 Md.App. 583, 595, 487 A.2d 1196 (1985).

The majority also maintains that construing the statute so that "use" and "possess" are not synonymous would lead to absurd consequences. Without conceding the correctness of that view, I again remind the majority that the language of the statute is unambiguous. If the result is absurd, it is a matter that is properly addressed not to the courts, but to the legislature for correction. We may not under the guise of statutory interpretation, change the plain meaning of the statute, "to supply omissions or remedy possible defects in the statute, or to insert exceptions not made by the legislature." *Amalgamated Casualty Insurance Co. v. Helms, et al,* 239 Md. 529, 535–36, 212 A.2d 311 (1965).

No evidence was presented in the instant case which would permit the reasonable inference that the appellant did anything more than "wear, carry, transport, or possess" a handgun during the commission of the housebreaking. It follows that the evidence was insufficient to sustain his conviction for "using" a handgun in the commission of that crime.