510 A.2d 270

**In re LUCAS F.**

**No. 1326, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

June 11, 1986.

Certiorari Denied Sept. 30, 1986.

Arthur G. House (Joseph M. Gorvoy and Hadley & House on the brief), Bethesda, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and Sally Williams, Asst. State's Atty. for Montgomery County on the brief, Rockville), for appellee.

Argued before GILBERT, C.J., and BISHOP and BLOOM, JJ.

GILBERT, Chief Judge.

Seven year old Steven Wilson was brutally assaulted. As a result of that beating, he sustained a depressed fracture of the skull in addition to facial lacerations and abrasions of both knees. Despite being led on a false trail by Steven's playmate, ten year old Lucas F., the police speedily concluded that Lucas was the assailant. The District Court of Maryland for Montgomery County, sitting as a juvenile court, found that Lucas was a delinquent; it ordered him committed to the Alfred D. Noyes Children's Detention Center.

How those events occurred we now relate as we set the stage upon which this tragedy unfolded.

Steven Leslie Wilson, Sr., the father of the injured boy, told the juvenile court that he returned home from work early in the afternoon of the day of the incident in order to "relieve the babysitter." The sitter told Mr. Wilson that "Stevie" had been playing in the backyard with Lucas "and that she had told Stevie if he went any place to be home by 3:00." Since Stevie was not in the yard and it was already half past that hour, the father looked "around the neighborhood" for his son. He even decided to check "the creek" area but did not find Stevie. He had just returned home when he saw Lucas pass the side door.

Lucas "proceeded to tell ... [Mr. Wilson] that ... [Lucas] and Stevie were playing at the creek and these big boys chased them with knives, and that he ran away and Stevie fell down and ... might be hurt." Mr. Wilson, accompanied by Lucas, proceeded with dispatch to the creek. He saw his son's crumpled body. He described his son as "kind of laying in ... an extended fetal position ... feet on the sand of the bank ... and his mouth in the water." Stevie "was unconscious ... breathing very shallowly or not at all."

The police were summoned and Lucas supplied them with a description of what ultimately proved to be fictitious assailants. Lucas went so far as to assist the police artist in making composite sketches of the two mythical youths who allegedly were the culprits, but who were actually the products of Lucas's imagination.

When Stevie regained consciousness, it was discovered that he suffered amnesia and was unable to recall the incident. Four days after the incident, Lucas was "picked up" as a runaway. He was transported to the Wheaton Police Station, and his mother was notified. She told the police that she would be at the station in approximately two hours.

Lucas's attempt to "run away" focused the attention and suspicions of the investigating officers upon him.

After questioning related to the assault, Lucas verbally admitted that he had fabricated the earlier story concerning

the two assailants. He said that Stevie was accidentally injured when he hit his head on the rocks while they were playing in the creek. Lucas was charged [1] and read his *Miranda* rights.[2] By that time his mother had arrived at the Wheaton station, but she was not informed that her ten year old son was being interrogated concerning the assault and battery of Stevie or that he had executed a waiver of his *Miranda* rights.

At the conclusion of a two-day trial in the District Court of Maryland for Montgomery County, sitting as a juvenile court, Lucas was found to be delinquent.

On appeal to this Court, Lucas flails at the findings of the trial judge in a pentad of verbal barrages. He asserts:

"1.  [T]he court below erred in admitting the statement of a 10-year-old [who] was in police custody, where the statement was obtained (1) without giving *Miranda* warnings to the child or any accompanying adult and (2) on the basis of an improper inducement made to the child.

2.  [T]he court below erred in admitting the statement of a 10-year-old child under police arrest without the presence of a parent or an attorney, where the child purportedly waived his constitutional rights by signing a police waiver form after a two minute explanation of rights by the police.

3.  [T]he court below erred by refusing to permit or consider expert testimony for the respondent to challenge the competency of the 7-year-old alleged victim, where the expert was prepared to testify that the child had suffered a concussion and amnesia that rendered him unable to perceive or recall accurately the events surrounding his

---

**1.**  The record is contradictory as to the time when Lucas was arrested. At one point the time of arrest was fixed at 11:30 a.m., but at another place in the transcript the time was set at 2:17 p.m.—after the *Miranda* warnings.

**2.**  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

injury, and where the expert had observed parental coaching of the alleged victim before the adjudicatory hearing.

4. [T]he trial court erred in refusing to recuse itself in light of the court's acknowledged prehearing exposure to and reliance upon news media stories, *ex parte* communications by the sheriff's office, and detailed knowledge of the findings and conclusions of the court Diagnostic Unit relating to Lucas, the incident, and his statements to police.

5. [T]he state sustained its burden of proving beyond a reasonable doubt that the accused 10-year-old had committed the wrongs alleged in the delinquency petition."

### *Miranda and the Ten Year Old Offender*

We view issues 1 and 2 as intertwined. We, therefore, shall consider both issues under the same general heading.

■ Initially, in any case involving a purported *Miranda* violation, a determination must be made as to whether the party was in custody at the time of interrogation. *In Re: Shannon A.*, 60 Md.App. 399, 483 A.2d 363 (1984). *Miranda* warnings are only required where there is a "custodial interrogation." *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

The Court of Appeals in *Whitfield v. State*, 287 Md. 124, 140, 411 A.2d 415, 425 (1980), *cert. dismissed*, 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980), said:

"[T]he custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation [*Myers v. State*, 3 Md.App. 534, 537, 240 A.2d 288, 290 (1968).]"

The Court opined that the particular sequence of events preceding and following interrogation may also be probative of custody.

"[A court should look to] how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning."

*Whitfield,* 287 Md. at 141, 415 A.2d at 425 (citations omitted).

■■■ Viewing the "factual setting surrounding the interrogation" in the present case, we hold that Lucas was significantly deprived of his freedom of action and was in custody within the meaning of *Miranda.* In the case of a juvenile, it is reasonable, we think, for courts to apply a wider definition of custody for *Miranda* purposes. The factual setting revealed by the record shows a ten year old child, with no more than a fourth grade education, who was picked up as a runaway. He was transported to a police station where he was interrogated for several hours by detectives. He was not informed that he was free to leave the station, nor was he told that his mother was in the stationhouse waiting room. Moreover, there was testimony from a detective which explicitly said that Lucas was in "police custody." We are led to the conclusion, therefore, that Lucas reasonably perceived himself to be in the custody of the police.

Having established that Lucas was in custody and that *Miranda* touched, if it did not embrace, that custodial situation, we now turn to the matter of the validity of the waiver.

■■■ Undoubtedly, Lucas signed a paper writing in which he waived his right to the presence of counsel. The paper writing superficially satisfies *Miranda*'s dictates. Facially it appears constitutionally consecrated. But in the case of a child of age ten years, is that enough? Did he realize what

services an attorney could perform for him? Did he understand that he was incriminating himself? Is an uncounseled *Miranda* waiver from a ten year old child enough to satisfy due process? Do justice and fundamental fairness require that the child have the benefit of the guidance of a parent or guardian before the child may waive *Miranda* rights?[3]

Those questions and others lead us to believe that Lucas's waiver of *Miranda* was almost, if not totally, meaningless. It is one thing to hold that an adult need not be advised of an attorney's presence in another room, particularly when the adult did not request the attorney. *Moran v. Burbine,* — U.S. —, 106 S.Ct. 1135, 89 L.Ed. 40 (1986). It is a far different thing to declare, as a matter of law, that a ten year old child need not be informed that his mother awaits in an adjoining room. The Supreme Court may have declined to lengthen *Miranda*'s reach, but it certainly did not amputate any portion of that protective arm.

■ We hold that ordinarily a ten year old child is entitled to the counseling and guidance of a parent or guardian before he or she may validly waive the constitutional rights protected by *Miranda*. If, however, the State is able to demonstrate to the trial judge that a particular ten year old child had the mental capacity to comprehend the significance of *Miranda* and the rights waived, the judge might be justified in accepting a *Miranda* waiver. *Lewis v. State,* 259 Ind. 431, 288 N.E.2d 138 (1972). Each case, of course, will turn on its own facts. On the basis of the record

---

3. We are aware that during the interrogation of Lucas, the following exchange occurred:
"Q. Why did you run away last night?
A. I don't want to answer that question.
Q. Why.
A. You said I don't have to answer that question if I don't want to.
Based on those questions and answers, we are unable to infer that Lucas was fully cognizant of the meaning of *Miranda*.

before us, the failure to suppress Lucas's written statement was error.

## Voluntariness Vis-a-Vis Inducement

■■ Even if Lucas could be said to have made a knowing, intelligent, and voluntary waiver of *Miranda,* we would still reverse the judgment of the juvenile court. We would do so on the basis of *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), and the cases therein cited. The late Judge Digges penned for the Court in *Hillard,* 286 Md. at 153, 406 A.2d 420, that:

> "[I]t clearly emerges that under Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible."

With respect to Lucas's statement, Detective Campbell testified:

> "[A]t that point I told Lucas ... that eventually Steven Wilson would remember what happened.... If what Lucas had told me was not the truth and was not everything that had occurred, that now was the time to tell me so that there would be no problem later if Steven recalled a different account of the incident."

It is abundantly clear that Campbell's testimony represents an inducement to Lucas to tell the truth "so there would be no problem later." That exhortation by the detective might have sown, and probably did sow, the seeds of a subauditur in Lucas's mind that if he related the events that had transpired at the creek, he would avoid subsequent problems. The inducement, we think, flies straight in the face of *Hillard* and, consequently, was impermissible. For that reason, alone, Lucas's statement should have been suppressed.

### Sufficiency of Evidence

We need not and do not decide the other issues raised by Lucas, except we must determine whether the valid evidence established beyond a reasonable doubt that Lucas committed the wrongs alleged.

If the evidence is insufficient, then under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980); *Wallace v. State,* 63 Md.App. 399, 492 A.2d 970 (1985), the matter would be at an end.

The testimony of Stevie Wilson was that Lucas "dunked" Stevie's head in the water, "then I just fall [sic] asleep and get [sic] unconscious for a minute." He said that they were just playing together when "all of a sudden he starts beating me up for nothing." There was other testimony in the transcript, but key words or sentences are missing. Instead, in their place appear "(inaudible)" and "[sound]." We are unable to ascribe any particular meaning to those expressions or descriptions. The trial judge, however, did not labor under the same handicap. He could hear the testimony directly from the lips of the victim and he was not dependent on a transcript of an electronic recording to inform him of the content of the testimony.

■ Our review of the record, coupled with the ability of the trial judge to hear what is missing from the transcript, leads us to think that Stevie's testimony, if believed, is sufficient beyond a reasonable doubt to support the finding of delinquency. We shall not terminate the case. Instead we remand it to the juvenile court for further proceedings consistent with this opinion.

JUDGMENT REVERSED.

CASE REMANDED FOR FURTHER PROCEEDINGS.

COSTS TO BE PAID BY MONTGOMERY COUNTY.