523 A.2d 627

**In re OWEN F.**

**No. 917, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

April 9, 1987.

Gary S. Offutt, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Ronald M. Levitan, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty., Rockville, for Montgomery County and Alan Bennett, Asst. State's Atty., Rockville, for Montgomery County, on the brief), for appellee.

Argued before WILNER, GARRITY and ALPERT, JJ.

ALPERT, Judge.

On March 20, 1986, police received a call from the owner of a "Buy and Sell" store that 4 youths had offered to sell $1,000.00 of camera equipment for $150. The caller stated that the boys carried the equipment in a black leather bag

and that they had a large radio with them. Police responded to the neighborhood of the store, located the youths and observed them for a short time. One of the four, later identified as appellant, Owen F. (Owen), carried a black leather bag.

When approached by police officers, the youths ran. In short order, three of the four were stopped, patted down, and asked for identification. None of the boys had identification, and the goods had disappeared. When asked by Officer Troup to locate the bag, Owen pointed to a garage doorway a short distance away. An officer retrieved the bag and radio from that spot. Owen was then asked where he got the goods he had been carrying, but apparently made no response. Police handcuffed and transported the four boys to the police station.

Owen was taken to a room where an inventory was made of his personal possessions. Among the property inventoried was a University of New Mexico, class of 1943, ring. An officer placed the ring with the radio and camera equipment on the assumption that it might be stolen.

Owen was handcuffed again and asked about his physical condition and educational background. It was established that he appeared sober, had a sixth grade education, could write, but had problems reading. The interrogating officer read Owen's *Miranda* [1] rights to him "verbatim" from a police form. The officer later testified what happened next:

> I said you don't have to tell me anything is what [the form] says. If you don't want to tell me anything, you don't have to tell me anything. I would like you to tell me. I think it is better that you tell me.

The officer then asked Owen if he was willing to answer questions. Owen said yes, indicated that he did not want a lawyer and signed a form indicating that he had been advised of and understood his rights.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

When asked again where the goods had come from, Owen stated that they had been taken during a break-in committed by another boy. An officer expressed doubt. Owen recanted and admitted he had participated in the burglaries. Owen stated that the radio had been taken a few days before his arrest; the other items, the day of that arrest. He then agreed to take police to the burglarized houses. This interrogation was conducted by two officers.

On the drive to the houses, Owen admitted he took the camera equipment, ring and other jewelry from one house and the radio from another. Police were sent to take fingerprints from both locations. Upon returning to the police station, Owen gave an inculpatory statement which an officer wrote down and Owen signed.

Owen's gesture to police (indicating the location of the stolen property), the stolen property, and Owen's statement at police headquarters were admitted into evidence against him during a hearing in the District Court of Maryland for Montgomery County, sitting as a juvenile court. The court found Owen delinquent and committed him to the Charles Hickey, Jr. School "with consideration for the Glen Mill School." This appeal followed; these issues are raised:

1. Whether evidence obtained on the day of Owen's arrest was acquired illegally and thus was inadmissible?
2. Whether the judge improperly excluded testimony from a victim concerning her ability to distinguish a photograph of her property from similar property?
3. Whether the judge erred in permitting a victim to testify that her husband had previously identified property found on Owen?
4. Whether Owen's disposition was illegal?

We shall address these issues in the order presented.

1. *Owen's Statements.*

Appellant contends that his streetside gesture, which led to the discovery of the radio and camera equipment, and his stationhouse confession, were obtained illegally. On the

basis of that contention, appellant argues that the court erred in admitting the gesture, the stolen goods, and the confession into evidence against him. The questions presented by this argument involve fundamental constitutional rights. Consequently, we are called to make an independent constitutional appraisal of the record. *See Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *Parker v. State,* 66 Md.App. 1, 10–11, 502 A.2d 510, *cert. denied,* 306 Md. 70, 507 A.2d 184 (1986).

### (a) *Streetside Gesture (pointing to the bag)*

Owen attacks on Fifth Amendment self-incrimination[2] grounds the admissibility of his gesture to Officer Troup indicating the location of the bag. Specifically, Owen argues that the gesture was obtained without the benefit of a *Miranda* warning.

We must first determine whether Owen was "in custody" when he signalled the location of the bag. While a mere investigatory stop will generally not constitute custody for *Miranda* purposes, if a suspect's freedom of action is curtailed to a degree associated with formal arrest, the "full panoply of protections prescribed by *Miranda*" must be afforded. *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). We note that, in the case of a juvenile, courts are called to apply "a wider definition of custody for *Miranda* purposes." *In re Lucas F.,* 68 Md.App. 97, 103, 510 A.2d 270 (1986).

In the case at bar, Owen got to the place of questioning by being caught during a police chase. That is, Officer Troup terminated Owen's briefly exercised freedom of movement. Once stopped, appellant was ordered to

---

**2.** The Fifth Amendment of the U.S. Constitution, made applicable to the states through the Fourteenth Amendment, *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), guarantees that no person "shall be compelled in any criminal case to be a witness against himself...."

"stand still." He and his friends were surrounded by at least four and perhaps six officers and asked for identification. Evidence offered later demonstrated that Owen had moved to America from Trinidad when he was approximately 10 years old. He was fourteen or fifteen at the time of this incident, spoke with an accent, had a sixth grade education, and a verbal I.Q. in the borderline range of 70. His educational skills were compared to those of a first or second grader. A psychologist opined at Owen's hearing that the boy would be "amenable, workable" and "impressionable" with an adult or authority figure. After being asked to locate the goods, Owen was handcuffed and driven to police headquarters. Applying the wider definition of custody afforded to juvenile cases, we conclude that a reasonable person under the circumstances outlined would not feel free to break off the questioning and that Owen's freedom of action was curtailed to a degree associated with formal arrest. In short, Owen was in custody.[3]

 Once Owen was in custody, police were obliged to inform him of his rights pursuant to *Miranda.* Their failure to do so made his gesture *qua* admission inadmissible at the subsequent hearing. *Miranda,* 384 U.S. at 476, 86 S.Ct. at 1628. Nevertheless, Officer Troup recounted the gesture, over counsel's objection, at Owen's hearing. The introduction of Owen's tainted body language, however, is not automatic grounds for reversal. If the introduction of that evidence is found to be harmless error, the conviction will stand. *See Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). That is, if the record demonstrates beyond a reasonable doubt that the admission of Owen's gesture in no way influenced the court's delinquency finding, the error in allowing the officer's testimony will

---

**3.** We are aware that, in considering Owen's education, age, nationality, intelligence and psychological traits, we have introduced subjective elements into the custody inquiry. We believe such considerations are proper under the "wider definition" to be afforded that term in juvenile cases. *See In re Lucas F., supra.*

be deemed harmless. *Dorsey,* 276 Md. at 659, 350 A.2d 665. Evidence obtained independently of the gesture and recounted by the court in announcing its finding shows that Owen was in possession of a University of New Mexico ring when taken into custody. Ms. Sonia Stein testified at Owen's hearing that the ring had been stolen from her house the night before Owen's arrest. Appellant's possession of the ring the next day, then, would support the court's determination that he had participated in that burglary. *See Samuels v. State,* 54 Md.App. 486, 493, 459 A.2d 213 (1983). Further, after his arrest, Owen admitted that he participated in both burglaries.[4] Fingerprints were taken and indicated that Owen had indeed been inside the burglared houses. The stationhouse admission and fingerprints were introduced at the hearing and were relied upon by the court in its finding. This evidence supports the court's delinquency determination and is not related to the tainted gesture. Therefore, the admission of Owen's gesture, though error, was harmless beyond a reasonable doubt.

We move now to consider whether evidence derived from the tainted gesture was improperly admitted against Owen.

### (b) *Camera Equipment and Radio*

Owen argues that the court erred in allowing the camera equipment and radio located by police into evidence. In addition to reasserting his Fifth Amendment challenge, Owen also contends that the introduction of this evidence violated his Fourth Amendment guarantee against unreasonable searches and seizures.[5]

---

**4.** This confession survives Owen's constitutional challenge *infra.*

**5.** The Fourth Amendment of the U.S. Constitution, made applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), reads in pertinent part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

We have indicated that Owen's streetside gesture was obtained in violation of *Miranda* but that the admission of the gesture into evidence constituted harmless error. We must now ask whether the admission of evidence derived from the unwarned gesture violated Fifth Amendment guarantees.

■ Evidence derived from a confession obtained without the benefit of a *Miranda* warning is excluded, if at all, under a relatively narrow interpretation of the "fruits of the poisonous tree" doctrine.[6] Under that interpretation, a failure to provide the *Miranda* warning does not necessarily preclude the introduction of derivative evidence. Rather, that evidence is inadmissible only if the confession from which it was derived was coerced in violation of defendant's right to due process. *See Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985). A confession is coerced for purposes of this inquiry if it results from "physical violence or other deliberate means calculated to break the suspect's will...." *Id.* at 312, 105 S.Ct. at 1295. Clearly, then, obtaining a confession in violation of the *Miranda* rule does not automatically destroy the admissibility of evidence discovered by using the unwarned confession.

■ In *Elstad,* the court considered the admissibility of a *second statement* by defendant derived from an earlier, unwarned, confession. Between statements, Elstad was read the *Miranda* litany. In holding the subsequent statement was admissible, the court relied, in part, on the interceding *Miranda* warning that allowed Elstad to exercise his free will. 470 U.S. at 308–309, 105 S.Ct. at 1293. Elstad's exercise of volition, then, washed part of the taint

---

**6.** The fruits doctrine maintains that "evidence derived from information acquired by police officials through unlawful means is not admissible in a criminal prosecution" and is an extension of the exclusionary rule mentioned, *supra,* in assessing appellant's challenge to the admissibility of his gesture to Officer Troup. Whitebread and Slobogin, *Criminal Procedure* § 2.04 (2d. ed.) at 34.

out of his later statement. In the case at bar, the derivative evidence consisted of inanimate objects. Therefore, no *Miranda* warning or act of free will preceded its discovery. The Supreme Court's partial reliance on the interceding act of free-will notwithstanding, we believe the holding in *Elstad* applies with equal force to cases in which an unwarned statement leads directly to the discovery of tangible, real evidence. This belief springs from the fact that the exclusionary rule, when enforced in the *Miranda* setting, is intended to avoid unreliable evidence borne of coercion and to deter police misconduct. In the case of tangible derivative evidence, the potential for untrustworthiness does not inhere in the article uncovered. Further, misconduct remains deterred with the knowledge that, if acquired through actual coercion, the derivative evidence is tainted. At least one decision has applied the *Elstad* rule to tangible derivative evidence. *See U.S. v. Cherry*, 794 F.2d 201, 208 (5th Cir.1986).

Applying the rule in *Elstad*, we perceive no error in the court's allowing the camera equipment and radio into evidence against Owen. That evidence, derived from the un-*Mirandized* gesture, was admissible absent some coercion, by police in obtaining the gesture. *Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293. There is no indication that police applied any deliberate means calculated to break Owen's will in asking him to locate the bag. The gesture was surrendered upon a casual inquiry. Consequently, the presence of the derivative evidence among the proof against appellant violated no Fifth Amendment interest.

■ Next, Owen argues that, when asked by police to locate the bag, he was under arrest without probable cause. Without probable cause, he continues, his warrantless arrest was illegal and evidence seized thereafter (the camera equipment and radio) was inadmissible. While searches and seizures incident to an illegal arrest are necessarily unreasonable, *Stanley v. State*, 230 Md. 188, 192–93, 186 A.2d 478 (1962), and no evidence secured from such a search and seizure may be introduced into evidence, *Mapp v. Ohio*, 367

U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), this rule of exclusion offers no solace to appellant. Owen abandoned the radio and camera equipment while being chased. With that abandonment, appellant left behind whatever Fourth Amendment protection he may have had against the seizure of those goods. *See Wynn v. State,* 69 Md.App. 536, 541–42, 518 A.2d 1072 (1987). The record simply fails to support Owen's Fourth Amendment challenge.

The camera equipment and radio were properly admitted into evidence.

### (c) *Stationhouse Statements*

Owen also argues that statements he made to police at the station were not knowingly or voluntarily made and thus were inadmissible. Appellant supports his assertion of involuntariness on three legs: expert testimony demonstrated that he was incapable of making a valid waiver; he was never told that he had a right to wait until his parents arrived to speak to police; and the police offered improper inducements to get him to confess.

Dr. Poireer, a psychologist, was permitted to testify as an expert as to Owen's ability to comprehend the *Miranda* warnings read to him at the stationhouse. Appellant points to the following testimony in arguing that he was incapable of comprehending *Miranda:*

[Dr. Poireer]: If you ask me did Owen understand each and every aspect of what was being said to him when he was Mirandized I would have to say that there is a question in my mind if he understood each and every aspect of it.

Later, however, the witness testified as follows:

Q. But is it in your opinion does Owen have intellectual capacity if someone asks him, Owen you don't have to talk to me, would he have the intellectual capacity to understand that?

A. I would say yes.

Dr. Poireer's opinion that Owen would understand someone who told him, "you don't have to talk to me," was enough to overcome the probative value of the question he raised but did not answer to any degree of certainty, about whether Owen understood "each and every aspect of [his *Miranda* warning]." Appellant exaggerates the import of Poireer's reservations. The totality of Dr. Poireer's testimony was enough "to demonstrate to the trial judge that [Owen] had the mental capacity to comprehend the significance of *Miranda* and the rights waived...." *In re Lucas F.*, 68 Md.App. at 104, 510 A.2d 270. The State, having established Owen's capacity to comprehend *Miranda* and the rights waived, was not also required to demonstrate that Owen received counseling and guidance from his parents in order to establish the validity of his waiver. *See Id.*[7]

■ Officer McFee testifed that he told Owen, "If you don't want to tell me anything, you don't have to tell me anything. I would like you to tell me. I think it is better that you tell me." The rule articulated in *Hillard v. State*, 286 Md. 145, 406 A.2d 415 (1979), is unambiguous:

[U]nder Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.

286 Md. at 153, 406 A.2d 415. Unfortunately, appellant never raised the issue of inducement at the hearing in his efforts to exclude his stationhouse statements from evidence. The issue, therefore, has not been preserved for our

---

7. We also reject the suggestion that the police were required to inform Owen that he was entitled to wait until his parents arrived before making a statement. While the absence of parental guidance goes to the question of voluntariness of a *Miranda* waiver in juvenile cases, *see In re Lucas F.*, 68 Md.App. at 104, 510 A.2d 270, police are not required to inform a juvenile that he has a right to speak to his parents as part of the *Miranda* litany.

review. Rule 1085; *von Lusch v. State,* 279 Md. 255, 368 A.2d 468 (1977). Even had the issue been preserved, we do not believe Officer McFee's statement, "It is better that you tell me" implied that it would be to Owen's advantage to make an inculpatory statement, in that Owen would be given help or some special advantage. McFee did not say in what way or for what reason it would be better for Owen to talk. *Cf., In re Lucas F., supra* (suspect told, "now was the time to tell me [about the assault] *so that there would be no problem later* if [victim] recalled a different account of the incident") (emphasis added). Nor did appellant establish that his inculpatory statements were made in reliance on McFee's words. Indeed, after recounting those words, McFee testified, *"after a while in talking to [Owen],* he did tell a story."* (Emphasis added). Owen's inculpatory statements, then, were made without compelling proximity to McFee's relatively innocuous comments.

Appellant's stationhouse statements were properly admitted against him.

2. *Victim's Photographic Identification of Stolen Property.*

▆ At the hearing Sonia Stein identified camera equipment and jewelry portrayed in several photographs as property belonging to her and her husband. Stein testified that the property had been stolen from her on March 19, 1986. On cross-examination, defense counsel asked Ms. Stein "if I showed you another camera just like that, you wouldn't know if it was your husband's or not would you?" *Sua sponte,* the court ruled, "sustained," though no objection was before it. The witness then admitted she could not distinguish a photograph of her property from one of similar property. The State did not move to strike this response. The witness went on to testify again that the photographs portrayed her stolen property.

On appeal, appellant argues that "counsel should have been allowed to ask Sonia Stein if she could distinguish between photographs of her own and similar property." The transcript clearly shows that counsel was permitted to

ask and the witness to answer that question. Indeed, Stein's answer was beneficial to the appellant. Thus, if the *sua sponte* ruling was erroneous, it was harmless error. Appellant overstated the value of his query when he argued that the question would "raise the possibility of a misidentification ... [and] might have raised a question as to appellant's possession of the fruits of a crime." On direct examination and without objection, the witness positively identified the property in the photograph. This, she repeated on cross-examination. Her admission during cross-examination that, *if shown a photograph of similar property*, she would be unable to distinguish it from a photograph of her own property, went merely to the weight of her earlier and later testimony that the photographed property belonged to her. The court was apparently satisfied with the reliability of Ms. Stein's photographic identification. Counsel's cross-examination did not have the effect desired.

3. *Victim's Testimony that Husband Identified Stolen Property.*

 Appellant next asserts that the trial court erred in permitting Sonia Stein to testify that her husband had identified the stolen property before the hearing. Owen argues that this testimony constituted inadmissible hearsay.

Ms. Stein testified:

COURT: And that the ring that you have and the bracelet that happens to be here together with the picture is your property?

A: Yes. I mean my husband went to the police station to identify and he had the paperworks and different cameras....

MS. HARVEY: Objection Your Honor.

COURT: You may continue ma'am.

A: And different cameras and lenses that had the ... the paperwork for it to prove that it was ours.

COURT: That is pretty nice to do. You had (unclear word) do that. Any other questions of this witness?

MS. HARVEY: No sir.

Hearsay testimony is an out-of-court statement offered in court as an assertion to show the truth of matters asserted therein. *See Casper v. State,* 70 Md.App. 576, 587 n. 9, 521 A.2d 1281 (1987). Appellant's objection interrupted the statement assigned as hearsay. The court instructed the witness to continue, thereby denying the objection. Ms. Stein finished her statement but appellant did not reassert his objection or move to strike the response. Thus, appellant's hearsay objection was waived. *See* E. Cleary, *McCormick on Evidence,* § 52 (3rd ed. 1984) at 131–132. In any event, Stein's testimony merely indicated that her husband went to the station to identify the goods. Assuming, arguendo, that her husband's actions amounted to an out-of-court assertion of ownership, this testimony was merely cumulative to the witness's own, in-court, identification of the property. Under those circumstances, its admission, if error, was harmless error. *See Dorsey v. State, supra,* 276 Md. at 652–53, 350 A.2d 665.

*4. Disposition.*

 Finally, appellant contends that, because his disposition occurred before July 1, 1986, the court was without authority to commit him to a particular institution.[8]

Juvenile courts are authorized to make a disposition after a child has been found delinquent. Md.Cts. & Jud.Proc. Code Ann. § 3–820 (1984 Repl.Vol.). The law in effect at the time of Owen's disposition provided:

In making a disposition on a petition, the court may:

. . . . .

---

**8.** An amendment to the juvenile commitment statute, effective July 1, 1986, gives the court authority to commit a juvenile "on terms that the court considers appropriate to meet the priorities [set forth in the statute]" Md.Cts. & Jud.Proc.Code Ann. § 3–820(c)(1)(ii) (1986 Cum. Supp.). Though not articulated in appellant's brief, we assume that the significance of July 1, 1986 derives from this amendment. We express no opinion on the effect of this amendment on the commitment powers of juvenile courts.

Commit the child to the custody or under the guardianship of the Juvenile Services Administration, a local department of social services, the Department of Health and Mental Hygiene, *or a public or licensed private agency* . . . .

*Id.* § 3–820(c)(2) (emphasis added). Clearly, then, the court below was authorized to commit Owen to a particular agency. Here, the court committed him to the Charles Hickey, Jr. School with consideration for the Glen Mill School. Appellant does not contend that either of those institutions is not a public or licensed private agency as contemplated by the statute. We have observed that section 3–820 empowers the court to commit a child to such an agency but does not confer upon the court authority to control the commitment or to mandate the specific terms of the commitment. *In re George G.*, 64 Md.App. 70, 82, 494 A.2d 247 (1985). *But see* Md.Cts. & Jud.Proc.Code Ann. § 3–820(c)(1)(ii) (1986 Cum.Supp.). In the commitment *sub judice*, the court neither kept control nor mandated the terms of Owen's commitment. Therefore, we perceive no illegality in appellant's disposition.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.