■ The only remaining matter to be decided is the effective date of the sanction. Under *In re Goldberg,* 460 A.2d 982, 985 (D.C.1983), and Board Rule 8.5(b), a reciprocal suspension or disbarment may be made to run concurrently with the sanction imposed elsewhere if the attorney promptly notifies Bar Counsel of that sanction and voluntarily refrains from practicing in the District of Columbia. The Board's report tells us that Mr. Zilberberg has complied with this rule by submitting an affidavit "attesting to his cessation of practice in the District of Columbia since the date of his Virginia suspension." The Board accordingly recommends that our sanction be imposed *nunc pro tunc* as of the effective date of the Virginia suspension. We accept that recommendation.

**In the Matter of E.A.H., Appellant.**

**No. 88–FS–1319.**

District of Columbia Court of Appeals.

Argued April 24, 1992.
Decided Aug. 28, 1992.

Mitchell Linde, Washington, D.C., appointed by the court, for appellant.

Sidney R. Bixler, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

E.A.H., who was fourteen years of age at the time of the offense, was tried as a juvenile and adjudicated delinquent after having been found guilty at a bench trial of assault with a dangerous weapon and related possessory weapons charges. The case stemmed from the shooting of one Bruce Gaddy. On appeal, E.A.H. contends that the motions judge committed reversible error by denying his motion to suppress incriminating statements which E.A.H. made to police while a search warrant was being executed at his home. The motions judge held that E.A.H. was not in custody when the statements were made, that no *Miranda* warning was therefore required,[1] and that the statements were voluntary. We affirm.

## I

The principal facts are undisputed. Detective Donald Gossage, together with a second detective and several uniformed officers of the Metropolitan Police Department, executed a search warrant at 8:30 one Friday morning at the home in which E.A.H. lived with his mother and his siblings, including his co-respondent half-brother, S.W. The officers placed all of the occupants of the house in the living room on the ground floor while the warrant was being executed. Armed officers guarded all of the exits, and E.A.H. was obviously "seized" and not free to leave. A pistol was recovered in S.W.'s front upstairs bedroom.

Detective Gossage interviewed the respondents one at a time in the front upstairs bedroom, with the door open, but with no one else present. After speaking with S.W., Gossage called in E.A.H. He showed E.A.H. the search warrant and explained that he was looking for the weapon with which Bruce Gaddy had been shot. He asked if the pistol which police had just found was used to shoot Gaddy. E.A.H. responded in the negative. In response to further questions by Detective Gossage, however, E.A.H. stated that the pistol was his and that he was the person who had shot Gaddy.

E.A.H. was not told that he was under arrest, and he received no *Miranda* warning during the brief interview, which lasted only about three minutes. Detective Gossage did not draw his weapon during the interview, nor did he use any deceptive or overtly coercive tactics of any kind.

After completing the questioning, Detective Gossage and the other officers prepared to leave the house. Before they departed, E.A.H.'s mother asked if anybody would be arrested that morning, and Gossage said that nobody would. He explained that the investigation was continuing, and requested the mother to bring three of her sons, including S.W. and E.A.H., to the police station the following Sunday. When she did so, both respon-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

dents were read their *Miranda* rights, questioned further, and then arrested.

Prior to his trial, E.A.H. moved to suppress the incriminating statements he had made to Detective Gossage in the upstairs bedroom. After hearing the testimony, the motions judge found that Detective Gossage had used no coercion, "though obviously the officers standing at the doorway were interested (and properly so) to prevent anyone from leaving while the search was executed." He noted that the respondents had been interrogated in their own home, "within earshot of their family through an open door," a fact which he viewed as rendering the atmosphere less coercive than that in a police station. Characterizing the *Miranda* doctrine as a "prophylactic rule" which was "designed to forestall the worst kinds of unconstitutional interrogation [of] people in police custody," the judge held that E.A.H. had not been in custody and denied the motion to suppress.[2] A different judge found E.A.H. guilty at the factfinding hearing, which is the juvenile analogue of a trial. *See* D.C.Code § 16–2317 (1989).

## II

 The sole question on this appeal is whether E.A.H. was in police custody when he made his incriminating statements. In reviewing the motions judge's decision on that issue, we defer to his findings of evidentiary fact, but determine the ultimate question of law *de novo*. *Cf. United States v. Gayden*, 492 A.2d 868, 872 (D.C. 1985) (dealing with the issue of seizure, but apparently treating it as equivalent to the question of custody for purposes of scope of review). The inquiry is an objective one, and the court must consider the totality of the circumstances. *State v. Willis*, 145 Vt. 459, 494 A.2d 108, 117 (1985).[3]

The Court stated in *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." Since *Miranda*, the Court has narrowed the definition of custodial interrogation to include only those cases in which there has been a "formal arrest or restraint on freedom of movement *of the degree associated with a formal arrest.*" *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (emphasis added and citations and internal quotation marks omitted); *Berkemer v. McCarty*, 468 U.S. 420, 439– 40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). Furthermore, this court has held that a restraint on liberty which would constitute a seizure under the doctrine of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), does not necessarily place the seized person in custody for *Miranda* purposes. *McIlwain v. United States*, 568 A.2d 470, 472–73 (D.C.1989);[4] *see Berkemer, supra*, 468 U.S. at 439–40, 104 S.Ct. at 3150. Moreover, this court has twice rejected the notion that a person was in custody for *Miranda* purposes because he was questioned during the execution of a search warrant in his home, even though he was not free to leave. *Tyler v. United States*, 298 A.2d 224, 226–27 & n. 4 (D.C. 1972); *Wells v. United States*, 281 A.2d 226, 228 (D.C.1971). These decisions present difficulties for E.A.H. which, in our view, he cannot surmount.

As stated earlier, the test for whether a person is in custody is an objective one; "the ... relevant inquiry is how a reason-

---

2. In reaching his decision, the judge stated that "one of [the respondents] (I think it was Mr. H) was expressly told at the outset that he was not being arrested at that time." This finding was erroneous; Detective Gossage testified that he had made this statement to S.W., not to E.A.H. Since the judge also denied S.W.'s motion to suppress his statements, however, this error obviously did not affect the result.

3. *But see State v. Brunell*, 150 Vt. 388, 554 A.2d 242, 243 (1988) (holding that the trial court's finding that the defendant was in custody during police interrogation will not be disturbed unless clearly erroneous).

4. "Thus, while seized, appellant was not in custody to the 'degree associated with formal arrest.'" *McIlwain, supra*, 568 A.2d at 473, quoting *Berkemer, supra*, 468 U.S. at 440, 104 S.Ct. at 3150.

able man in the suspect's position would have understood his situation." *Berkemer, supra,* 468 U.S. at 442, 104 S.Ct. at 3151. In *Berkemer* the Court quoted, with apparent approval, language of the New York Court of Appeals justifying an objective inquiry on the ground, *inter alia,* that it does not "place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question." *Id.* at 442 n. 35, 104 S.Ct. at 3151 n. 35 (quoting *People v. P.,* 21 N.Y.2d 1, 9–10, 286 N.Y.S.2d 225, 232, 233 N.E.2d 255, 260 (1967)). *Cf. Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565 (1988) ("reasonable person" standard for determining whether seizure has occurred "ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached"). Nevertheless, juveniles are not simply younger adults, a fact which has prompted one court to state that "[i]n the case of a juvenile, it is reasonable ... for courts to apply a wider definition of custody for *Miranda* purposes." *In re Lucas F.,* 68 Md.App. 97, 510 A.2d 270, 273 (1986); *accord, In re Owen F.,* 70 Md.App. 678, 523 A.2d 627, 630 (1987). *See also* 3 WILLIAM E. RINGEL, SEARCHES & SEIZURES, ARRESTS & CONFESSIONS §§ 27.3, at 27.7 (2d ed. 1992).

■ We conclude that it is unnecessary for us to decide whether the objective reasonable person test for custody may properly include "subjective elements," *In re Owen F.,* 523 A.2d at 630 n. 3, where juveniles are concerned. In the present case, which is quite unlike *Lucas F.* and *Owen F.* factually,[5] we are satisfied that, even taking into consideration E.A.H.'s youth, the restraint on E.A.H.'s liberty dur-

ing his brief questioning in a room in his home with the door open, did not approach a level comparable to that of a formal arrest.[6] No weapons were drawn, E.A.H. was not handcuffed, and the police left without arresting him. Moreover, E.A.H. was interviewed after his half-brother, and was able to see that the latter was, at least, not formally arrested. Although E.A.H. was or became a suspect, and although there was probable cause to arrest him after his admission to Detective Gossage, neither fact is a conclusive indication of custody for *Miranda* purposes. *See Beckwith v. United States,* 425 U.S. 341, 346–48, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1 (1976); *Calaway v. United States,* 408 A.2d 1220, 1224–25 (D.C.1979). Accordingly, the judgment appealed from is hereby

*Affirmed.*

MACK, Senior Judge:
I respectfully dissent.

---

5. *Lucas F.* involved a ten-year old who was picked up as a runaway and transported to a police station, where he was interrogated for several hours by police without being advised of his rights or being told that his mother was in the stationhouse waiting room. An officer explicitly referred to the respondent as being in "police custody." 510 A.2d at 273. In *Owen F.,* a fourteen-year old boy from Trinidad with a verbal I.Q. of 70, who spoke with an accent and operated at the first or second grade level, was apprehended after a police chase, handcuffed, driven to police headquarters, and interrogated

without being advised of his *Miranda* rights. In each of these cases, the respondent was held to be in police custody during interrogation.

6. E.A.H.'s mother testified that she did not join E.A.H. in the bedroom when he was being interrogated because she believed that she was not supposed to. It does not appear that she asked to be admitted or that E.A.H. requested that she be present. In any event, the fact of her absence does not vitiate E.A.H.'s confession. *See In re T...T.,* 365 A.2d 366, 370 n. 5 (D.C.1976).