**James G. KEETER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 92–CF–294.**

District of Columbia Court of Appeals.

Argued Nov. 1, 1993.

Decided Dec. 29, 1993.

David W. Bos, Public Defender Service, with whom James Klein and Jo–Ann Wallace, Public Defender Service, were on the brief, for appellant.

Renate D. Staley, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Miriam Smolen, Asst. U.S. Attys., were on the brief, for appellee.

Before FARRELL, WAGNER, and KING, Associate Judges.

FARRELL, Associate Judge:

This is an appeal from appellant's conviction for voluntary manslaughter while armed. The question we must decide is whether, when the police awakened appellant in his bedroom with guns drawn, ordered him to raise his hands and frisked him, told him they needed to talk to him at the police station, then transported him to the homicide office for questioning, all without probable cause, he was detained in a manner that was the functional equivalent of a formal arrest. The government in effect concedes that if appellant was under detention when he accompanied the detectives to the homicide office for interrogation, then he was arrested without probable cause and his statements to the police must be excluded as the fruit of the unlawful arrest.[1] The government con-

---

1. That is, as explained in part II.C., *infra*, the government does not and could not reasonably argue that the effects of the illegality were dissipated under the test of *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and related "attenuation" cases.

tends, however, that appellant voluntarily chose to go with the police to the station despite the admitted seizure in the bedroom moments before. The trial court agreed, although with considerable reservation. As "[t]his is a question of law which we must answer based on our [own] assessment of the evidence," *United States v. Gayden,* 492 A.2d 868, 872 (D.C.1985), we have examined the evidence carefully. We conclude that, notwithstanding the fact mainly relied on by the government—*i.e.,* the detectives' repeated "insistence" to appellant that he was not under arrest—the totality of facts demonstrates that appellant would not reasonably have believed that he could spurn the detectives' implied command to accompany them to the police station. Since the resultant seizure amounted to an arrest under governing Supreme Court law, appellant's statements at the station must be suppressed.[2]

### I.

Late in the evening of January 12, 1990, Chet Harrison received multiple stab wounds from which he died. Homicide detectives responded to the scene and learned from eyewitnesses that Harrison, at the time of the stabbing, had addressed his assailant as "Jay" or "Jake" in pleading, "Why [are] you doing this to me?" Though the witnesses did not know the assailant, one described him in some detail and another generally, and a police officer familiar with the neighborhood informed the detectives that a man he knew as "Jay" sometimes stayed with a relative at a house in the same block. Between 7:30 and 8:30 the next morning, three detectives went to the house and spoke with appellant's sister. When they asked her if she knew a "Jay" and described the suspect, she directed them to her sister's house across the street. The detectives went to that house, knocked, and were admitted by another sister of appellant. When they told her they were looking for "Jay" in connection with a murder, she replied that Jay was upstairs in the

bedroom. Two detectives drew their guns and went upstairs, where they found appellant lying across a bed asleep but clothed. Detective Wade hollered "Jay" and woke appellant up, then told him to raise his hands and patted him down, finding no weapon. The detectives reholstered their guns and brought appellant downstairs to the living room.

As appellant sat in the living room putting on his shoes, Wade told him he was not under arrest but that the detectives "were investigating a murder that occurred three doors up from the house where ... [they] located him and [that they] needed to talk to him." Either at this point or a short time later, appellant was told he was a suspect in the murder. On direct examination Wade explained:

> I advised him while [*sic; why*] we were there and I told him that he wasn't under arrest. I told him I needed to talk to him for questioning downtown. I insisted that he wasn't under arrest.

On cross-examination Wade was pressed about the exact words he had used:

> Q. Okay. Now, you told him that you needed to take him down for questioning; right?
>
> A. Yes, ma'am.
>
> Q. And to the best of your recollection those were your exact words; right?
>
> A. Yes. Well, that he wasn't under arrest.
>
> Q. He wasn't under arrest but you needed to take him down for questioning.
>
> A. Yes, ma'am.

Acknowledging that he had not told appellant he had "a choice whether or not to come down to the station" or that he could "stay here if you'd like," Wade reiterated: "I told him that he wasn't under arrest and that I needed to talk to him down at the Homicide Branch."[3] When the court asked Wade

---

**2.** The government makes no argument that the admission of the statements at trial was harmless error.

**3.** Wade again testified at the hearing that he "asked [appellant], you know, to come down, I had to talk to him." At trial Wade's testimony

differed somewhat, in that he told appellant, not that he "needed to take him down for questioning," but that appellant "would have to come down to the homicide office to answer some questions."

whether he could not have questioned appellant in the living room, Wade replied, "Yes, I could but ... he was a suspect at the time and ... we do everything down at the homicide office with the typewriter, you know, taking statements." Asked what he would have done if appellant had refused to come downtown, Wade answered, "I wouldn't have forced him down or nothing"; instead he would have sought to have appellant subpoenaed before the grand jury—although he conceded that no government attorney had ever directed him "to subpoena a suspect ... to a grand jury to testify."

En route to the police station appellant sat unhandcuffed in the back seat of the police car next to Detective Wade, while Detective Randally drove. Wade explained that "when we're transporting a suspect" downtown, he usually sat next to the suspect behind the driver "for security reasons." Eliciting what those reasons were, defense counsel asked, "And you don't want them to leave?", to which Wade answered, "No." Wade again agreed that one of the reasons he sat in the back with appellant, "who was a suspect, was to prevent him from leaving." But, responding to the question what he would have done if the car had stopped at a traffic light and appellant had jumped out, Wade stated: "[I]f he would have jumped out of the car, ... I would have gave chase to see what was wrong.... If he wanted to leave after I caught him, ... I would let him go." Upon arrival at the homicide office, appellant waived his *Miranda* rights and told Wade that "he understood that he was not under arrest." He then gave the statements that are the subject of this appeal.[4]

In denying appellant's motion to suppress, the trial court acknowledged—and the government did not dispute—that the police lacked probable cause to arrest appellant in the home and transport him to the police station.[5] The court found, as a threshold

matter, that the police had reasonable, articulable suspicion to detain and frisk appellant when they accosted him in the bedroom on the morning after the stabbing. Appellant questions this finding, but our disposition of the appeal makes it unnecessary to pursue the issue further. The trial court therefore undertook to resolve two questions: first, was appellant under arrest at any time until he made his incriminating statements at the station; and second, was he "under duress short of arrest" at the time he accompanied the police to the station. The court found "crucial" the facts that the police reholstered their weapons after escorting appellant to the living room, and "on at least two occasions" told him that he was not under arrest. The court further accepted Detective Wade's testimony that he told appellant "I need to talk to you down at the station," and the fact "that this police officer did not believe he had the defendant under arrest"—a belief supported by the "very good reason" that he lacked probable cause to arrest. The police "communicated as much as they conceivably could have communicated to the defendant that he was not under arrest." As to whether appellant was still seized—"short of arrest"—once the police removed him from the bedroom and transported him to the homicide office, the court at first found only that any coercion that existed did not constitute "duress ... tantamount to arrest." Later the court clarified its ruling by stating, "I am in essence finding this was not a detention ... it very simply was not a detention." The court found "no detention" by crediting Detective Wade's testimony that "he would have let [appellant] go if he climbed out at a stop light."

## II.

### A.

■ The decisive issue before us is whether appellant was detained against his will

---

4. Appellant was advised of and waived his *Miranda* rights twice at the police station, the second time after the police crossed out the boilerplate language on the advice card which states, "You are under arrest." He then made the statements at issue here. The trial court suppressed statements appellant gave at a later point after he had partially confessed, been told he was now under arrest, and invoked his right to an attor-

ney. The government has not challenged that ruling. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

5. Appellant did not challenge the consensual entry by the police into his aunt's home, *i.e.*, he raised no issue of failure of the police to obtain an arrest warrant.

when he accompanied the police to the homicide office or whether, as the government argues, he chose voluntarily to accompany the detectives despite the conceded initial curtailment of his liberty in the bedroom. The issue is critical to this appeal because, as we explain in part B, *infra*, *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and subsequent Supreme Court decisions leave no doubt that transporting a suspect against his will from a private dwelling to the police station for interrogation, without probable cause, violates the Fourth Amendment and requires suppression of ensuing statements unless the taint of the illegality has been dissipated.[6]

According to Detective Wade, the police "request[ed]" appellant to come with them to the police station but did not require him to do so. Accordingly, "the appropriate inquiry is whether a reasonable person [in appellant's position] would [have felt] free to decline the officers' request[ ] or otherwise terminate the encounter." *Florida v. Bostick*, —— U.S. ——, —— 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence [or request] and go about his business.'" *Id.* (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)). *See also In re J.M.*, 619 A.2d 497, 499–500 (D.C.1992) (en banc). We review the determination of seizure *vel non* as a question of law. *Id.* at 500.

The government understandably would begin the inquiry with events that occurred in the living room (*i.e.*, the detectives' reholstering their guns and repeatedly telling appellant he was not under arrest). Yet the circumstances of the encounter obviously began earlier when appellant was awakened from his sleep by police with guns drawn in the privacy of his bedroom. Few circumstances can be more intimidating to an innocent person.[7] *Cf. Dunaway*, 442 U.S. at 220, 99 S.Ct. at 2261 (Stevens, J., concurring) ("A midnight arrest with drawn guns will be equally frightening whether the police acted recklessly or in good faith"). When appellant was ordered out of bed, told to raise his hands, then frisked and escorted down to the living room, he can scarcely have doubted he was a suspect in the homicide the police told him they were investigating, and that his liberty was sharply curtailed. While the detectives immediately told him he was not under arrest, they also told him that they "need[ed] to talk to him down at the station" or "needed to take him down[town] for questioning."[8] Thus, we cannot agree with the government that common parlance would have instructed appellant that, since he was not under "arrest," he was also free to refuse compliance with their expressed "need" to take him downtown—an imperative underscored by their actions moments earlier. We likewise attach no weight to appellant's failure to protest as the police accompanied him to the police car. When Detective Wade seated himself next to appellant in the car, he did so partly to prevent the suspect from leaving. In light of the preceding events, appellant could not reasonably have seen the import of the detective's action differently.

·"Whether the officer announced or expressly disclaimed an intent to arrest is not determinative of whether an arrest has occurred...." *United States v. Gayden*, 492 A.2d at 872. What stands out on this record, given the actions of the police both before and after they told appellant he was not under arrest, is their failure ever to tell him he was not required to go with them to the police station. *Cf. United States v. Mendenhall*, 446 U.S. 544, 559, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) ("the fact that the officers themselves informed the [defendant]

---

6. In other words, the distinction which the trial court initially attempted to draw between an arrest and "duress short of arrest" has no legal significance in the context of a detention for custodial stationhouse interrogation.

7. As the Supreme Court emphasized in *Bostick*, "the 'reasonable person' test presupposes an in-

nocent person." —— U.S. at ——, 111 S.Ct. at 2388.

8. Any factual distinction between these two statements, coming as they did on the heels of appellant's forcible seizure at gunpoint, is inconsequential to our analysis.

that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive"). That omission may have been deliberate or it may have simply reflected the detectives' failure to appreciate the coercive atmosphere their actions had created, which could not be dispelled merely by reholstering their guns and telling appellant he was not under arrest.[9]

In sum, on this record we cannot reasonably hold that "appellant's accompanying the police to the police station was ... the result of his voluntary desire to cooperate with the police...." *Patton v. United States, supra* note 9, 633 A.2d at 816.[10] Appellant was seized in his bedroom by the police and remained under detention until he made admissions at the homicide office and was formally arrested.

### B.

"[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway v. New York*, 442 U.S. at 216, 99 S.Ct. at 2258. For this reason, the Court in *Dunaway* held that the police violated the Fourth Amendment "when, without probable cause, they seized [the defendant at the house of his neighbor] and transported him to the police station for interrogation." *Id.* In contrast to "the brief and narrowly circumscribed intrusions" permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, the Court determined that the detention in *Dunaway*—designed to permit custodial interrogation—"was in important respects indistinguishable from a traditional arrest." 442 U.S. at 212, 99 S.Ct. at 2256.

Since deciding *Dunaway*, the Supreme Court has been careful to point out that not every "temporary detention for questioning on less than probable cause" is prohibited, *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); "the [*Terry*] exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons...." *Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981). Thus, individual fact situations may present "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Nevertheless, since *Dunaway* the Court has never receded from the "view ... that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes," *Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985); no decision of the Court "[has] sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting, absent probable cause or judicial authorization." *Id.* at 815, 105 S.Ct. at 1646.

No additional legal discussion is necessary on this point, for, as stated at the outset, the government effectively rests its argument on

---

**9.** The fact that, as Detective Wade explained, he ultimately would have "let [appellant] go" if appellant jumped out of the police car (though after first chasing and catching him) is no more "conclusive on the issue of seizure" than had there been contrary testimony by police "that they would not have let [the defendant] leave if in fact he had desired to do so...." *Patton v. United States*, 633 A.2d 800, 815 (D.C.1993). The test remains what a reasonable person in appellant's position would have perceived.

**10.** *Patton*, in which we reached the opposite conclusion, bears no factual resemblance to this case. Likewise, the government's reliance on *Johnson v. United States*, 616 A.2d 1216 (D.C. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993), is ill-founded. There the defendant had indicated a willingness to provide information to the police, then accompanied them from a hospital to the police station when they said they "needed" him to come there to give a statement. At no point had he been physically detained, nor did the officers "ever brandish[ ] a weapon" or "ma[k]e any show of force," *id.* at 1229, 1231—facts in stark contrast to appellant's initial seizure in this case.

the claim that appellant voluntarily accompanied the detectives to the police station, a claim we have rejected. We therefore hold that appellant's detention and removal to the homicide office for questioning violated the Fourth Amendment. We express no opinion on the very different issue that would arise were the police, in similar circumstances, to attempt to question the suspect briefly in the home instead of immediately taking him to the station. *See Royer*, 460 U.S. at 500, 103 S.Ct. at 1325 (in determining whether detention amounted to *de facto* arrest, relevant fact is whether "the investigative methods employed ... [were] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time"). *Cf. In re E.A.H.*, 612 A.2d 836, 839 (D.C.1992) (brief questioning of defendant in bedroom of home with door open "did not approach a level comparable to that of a formal arrest").

## C.

It remains for us to decide whether appellant's statements were "obtained by exploitation of [the] illegal arrest." *Brown v. Illinois, supra* note 1, 422 U.S. at 603, 95 S.Ct. at 2261. The government, which has the burden of proving attenuation of such illegality, *id.* at 604, 95 S.Ct. at 2262, does not seek to do so in this case, and with good reason.[11] As in *Dunaway, supra*, "[n]o intervening events broke the connection between [appellant's] illegal detention and his confession." *Dunaway*, 442 U.S. at 219, 99 S.Ct. at 2260. The advice and waiver of *Miranda* rights could not alone suffice, *id.* at 217, 99 S.Ct. at 2259; appellant's statements were made less than an hour after his arrest, *see Brown*, 422 U.S. at 604, 95 S.Ct. at 2262 ("[defendant's] first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever"); and—as earlier at the house—appel-

lant was never told at the police station that he was free to leave. *Compare Dunaway*, 442 U.S. at 212, 99 S.Ct. at 2256 *and United States v. Allen*, 436 A.2d 1303, 1309 (D.C. 1981), *with Patton, supra*, 633 A.2d at 817 ("[T]he actions of the detectives at the homicide office, and especially the repeated reminder that appellant was not under arrest *and* that he was free to leave ... constitute sufficient attenuation ..." (emphasis added)).[12] The record here cannot support a conclusion that the effect of the illegal arrest was dissipated.

The judgment of the Superior Court is, therefore,

*Reversed.*

---

11. The government's "attenuation" argument is limited to the claim—already rejected—that the coercive effect of the original seizure was dissipated once the police reholstered their guns and told appellant he was not under arrest.

12. In *Patton* the court noted, *inter alia*: "When appellant signed the PD–47 'rights' card, the

detectives 'showed [appellant] that at any time he wanted to stop, he could stop, and he was free to get up and leave.' " 633 A.2d at 817. *See also id.* (footnote omitted) (at trial appellant "squarely stat[ed] that he was repeatedly told by the police: 'If you want to leave, you can leave anytime you want?' "